08-4092-cv
Whalen v. J.P. Morgan Chase & Co.

UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT

August Term, 2009

(Argued: August 3, 2009                    Decided: November 20, 2009)

Docket No. 08-4092-cv

MICHAEL J. DAVIS, and all others similarly situated, ELENA LOMBARDO, CAROL
SMITH, DANIEL J. MCGRAW,

*Plaintiffs,*

ANDREW WHALEN,

*Plaintiff-Appellant,*

— v.—

J.P. MORGAN CHASE & CO.,

*Defendant-Appellee.*

B e f o r e:

POOLER, LIVINGSTON, and LYNCH, *Circuit Judges.*[*]

Plaintiff, employed by J.P. Morgan Chase ("Chase") as an underwriter, challenges Chase's

---

[*] At the time of oral argument, Judge Lynch was a United States District Judge for
the Southern District of New York, sitting by designation.

1

categorization of underwriters as administrative employees exempt from the Fair Labor Standard

Act's overtime pay requirements. See 29 U.S.C. § 207(a). Plaintiff now appeals an award of

summary judgment entered in the Western District of New York (David G. Larimer, *Judge*)

in favor of Chase.

REVERSED.

_____

J. NELSON THOMAS, Dolin, Thomas & Solomon LLP, Rochester, New York, *for Plaintiff-Appellant*.

SAMUEL SHAULSON, Morgan, Lewis & Bockius LLP, New York, New York (Carrie A. Gonnell, Irvine, California, *on the brief*), *for Defendant-Appellee*.

_____

GERARD E. LYNCH, *Circuit Judge*:

This appeal requires us to decide whether underwriters tasked with approving

loans, in accordance with detailed guidelines provided by their employer, are

administrative employees exempt from the overtime requirements of the Fair Labor

Standards Act. Andrew Whalen was employed by J.P. Morgan Chase ("Chase") for four

years as an underwriter. As an underwriter, Whalen evaluated whether to issue loans to

individual loan applicants by referring to a detailed set of guidelines, known as the Credit

Guide, provided to him by Chase. The Credit Guide specified how underwriters should

2

determine loan applicant characteristics such as qualifying income and credit history, and instructed underwriters to compare such data with criteria, also set out in the Credit Guide, prescribing what qualified a loan applicant for a particular loan product. Chase also provided supplemental guidelines and product guidelines with information specific to individual loan products. An underwriter was expected to evaluate each loan application under the Credit Guide and approve the loan if it met the Guide's standards. If a loan did not meet the Guide's standards, certain underwriters had some ability to make exceptions or variances to implement appropriate compensating factors. Whalen and Chase provide different accounts of how often underwriters made such exceptions.

Under the Fair Labor Standards Act (FLSA), employers must pay employees overtime compensation for time worked in excess of forty hours per week. See 29 U.S.C. § 207(a). Whalen claims that he frequently worked over forty hours per week. A number of categories of employees are exempted from the overtime pay requirement. The exemptions are drawn along a number of lines demarcating the type of profession, job function, and other characteristics. One categorical exemption is for employees who work in a "bona fide executive, administrative, or professional capacity." 29 U.S.C. § 213(a)(1).[1]

At the time of Whalen's employment by Chase, Chase treated underwriters as

_____

[1] Chase does not contend that Whalen engaged in "executive" or "professional" work, or fell within any other exception to the maximum hours provision of the FLSA.

3

exempt from the FLSA's overtime requirements. Whalen sought a declaratory judgment that Chase violated the FLSA by treating him as exempt and failing to pay him overtime compensation. Both Whalen and Chase filed motions for summary judgment. The district court denied Whalen's motions and granted Chase's motion, dismissing Whalen's complaint. This appeal followed.

We review the district court's ruling on a motion for summary judgment de novo, construing the evidence in favor of the non-moving party. See Krauss v. Oxford Health Plans, Inc., 517 F.3d 614, 621-22 (2d Cir. 2008); Petrosino v. Bell Atl., 385 F.3d 210, 219 (2d Cir. 2004). We may affirm the district court's grant of summary judgment on any ground upon which the district court could have relied. See Santos v. Murdock, 243 F.3d 681, 683 (2d Cir. 2001). Exemptions from the FLSA's requirements "are to be narrowly construed against the employers seeking to assert them and their application limited to those establishments plainly and unmistakably within their terms and spirit." Arnold v. Ben Kanowsky, Inc., 361 U.S. 388, 392 (1960).

The statute specifying that employees who work in "bona fide executive, administrative, or professional capacit[ies]" are exempt from the FLSA overtime pay requirements does not define "administrative." 29 U.S.C. § 213(a)(1). Federal regulations specify, however, that a worker is employed in a bona fide administrative capacity if she performs work "directly related to management policies or general

4

business operations" and "customarily and regularly exercises discretion and independent judgment." 29 C.F.R. § 541.2(a).[2]  Regulations further explain that work directly related to management policies or general business operations consists of "those types of activities relating to the administrative operations of a business as distinguished from 'production' or, in a retail or service establishment, 'sales' work."  29 C.F.R. § 541.205(a).[3]  Employment may thus be classified as belonging in the administrative category, which falls squarely within the administrative exception, or as production/sales work, which does not.

Precedent in this circuit is light but provides the framework of our analysis to identify Whalen's job as either administrative or production.  In Reich v. State of New York, 3 F.3d 581 (2d Cir. 1993), overruled by implication on other grounds by Seminole Tribe v. Florida, 517 U.S. 44 (1996), we held that members of the state police assigned to the Bureau of Criminal Investigation (BCI), known as BCI Investigators, were not exempt as administrative employees.  See id. at 585, 588.  BCI Investigators are responsible for supervising investigations performed by state troopers and conducting their own

---

[2] The Department of Labor issued new regulations defining the administrative exemption in 2004.  Unless otherwise specified, reference to the regulations is to the pre-2004 regulations.

[3] Although there are other requirements to fall within the exemption, such as customarily and regularly exercising discretion, because we conclude that Whalen's work was not "administrative," we need not decide whether Whalen's employment as an underwriter met those requirements.

5

investigations of felonies and major misdemeanors. Applying the administrative versus production analysis, we then reasoned that because "the primary function of the Investigators . . . is to conduct – or 'produce' – its criminal investigations," the BCI Investigators fell "squarely on the 'production' side of the line" and were not exempt from the FLSA's overtime requirements. Id. at 587-88.

The administrative/production dichotomy was similarly employed in a Vermont case we affirmed last year, but the circumstances of our affirmance limit its precedential value. The facts of that case were similar to those presented here: the plaintiffs were employed as underwriters for a company in the business of underwriting mortgage loans that were then sold to the secondary lending market. See Havey v. Homebound Mortgage, Inc., No. 2:03-CV-313, 2005 WL 1719061, at *1 (D. Vt. July 21, 2005), aff'd, 547 F.3d 158 (2d Cir. 2008). The district court concluded with very little analysis that the underwriters were not employed in production because they performed "nonmanual work related to Homebound's business." Id., at *5 Significantly, the court appeared to assume that "production" must relate to tangible goods, citing a Connecticut case in which the court refused to grant summary judgment finding that material planning specialists, senior financial analysts, project financial analysts, and logistics specialists employed by a company that built submarines were exempt from FLSA's overtime requirements. See id. at *5 n.6, citing Cooke v. Gen. Dynamics Corp., 993 F. Supp. 56 (D. Conn.1997). The

6

Havey court noted that "[i]n that case . . . the corporation was in the business of producing submarines. Homebound was in the business of underwriting mortgage loans. No production was taking place." Id. (citations omitted).

As Reich illustrates, this literal reading of "production" to require tangible goods has no basis in law or regulation. We affirmed the district court in Havey, but the only issue presented on appeal was whether plaintiffs were paid on a salary basis under the payment structure adopted by Homebound. Accordingly, our opinion offered no analysis as to whether the underwriters performed work directly related to the management policies or general business operations of their employers under the FLSA. We therefore do not read our Havey opinion as adopting the flawed analysis of the Vermont court as to administrative and production job functions.

The line between administrative and production jobs is not a clear one, particularly given that the item being produced – such as "criminal investigations" – is often an intangible service rather than a material good. Notably, the border between administrative and production work does not track the level of responsibility, importance, or skill needed to perform a particular job.[4] The monetary value of the loans approved by

---

[4] Such considerations may be relevant to other, independent, requirements for exemption from the FLSA overtime provisions. The responsibility exercised by an employee, for example, would affect whether that employee "customarily and regularly exercise[d] discretion and independent judgment." 29 C.F.R. § 541.2. Such a determination, however, is entirely separate from whether an employee's function may be classified as administrative or production-related.

Whalen as an underwriter, for example, is irrelevant to this classification: a bank teller might deal with hundreds of thousands of dollars each month whereas a staffer in human resources never touches a dime of the bank's money, yet the bank teller is in production and the human resources staffer performs an administrative position. Similarly, it is irrelevant that Whalen's salary was relatively low or that he worked in a cubicle. What determines whether an underwriter performed production or administrative functions is the nature of her duties, not the physical conditions of her employment.

The Department of Labor has attempted to clarify the classification of jobs within the financial industry through regulations and opinion letters. In 2004, the Department of Labor promulgated new regulations discussing, among other things, employees in the financial services industry. Although these regulations were instituted after Whalen's employment with Chase ended, the Department of Labor noted that the new regulations were "[c]onsistent with existing case law." 69 Fed. Reg. 22,122, 22,145 (Apr. 23, 2004). The regulation states:

> Employees in the financial services industry generally meet the duties requirements for the administrative exemption if their duties include work such as collecting and analyzing information regarding the customer's income, assets, investments or debts; determining which financial products best meet the customer's needs and financial circumstances; advising the customer regarding the advantages and disadvantages of different financial products; and marketing, servicing or promoting the employer's financial products. However, an employee whose primary duty is selling financial

8

products does not qualify for the administrative exemption.

29 C.F.R. § 541.203(b).

The Department of Labor explained that the new regulation was sparked by growing litigation in the area and contrasted two threads of case law. On the one hand, some courts found that "employees who represent the employer with the public, negotiate on behalf of the company, and engage in sales promotion" were exempt from overtime requirements. 69 Fed. Reg.. 22,122, 22,145 (Apr. 23, 2004), citing Hogan v. Allstate Ins. Co., No. 02-15918, 2004 WL 362378 (11th Cir. 2004); Reich v. John Alden Life Ins. Co., 126 F.3d 1 (1st Cir. 1997); Wilshin v. Allstate Ins. Co., 212 F. Supp. 2d 1360 (M.D. Ga. 2002). On the other hand, the Department cited a Minnesota district court, which found that "employees who had a 'primary duty to sell [the company's] lending products on a day-to-day basis' directly to consumers" were not exempt. 69 Fed. Reg.. 22,122, 22,145 (Apr. 23, 2004), quoting Casas v. Conseco Fin. Corp., No. Civ. 00-1512(JRT/SRN), 2002 WL 507059, at *9 (D. Minn. 2002). The regulation thus helped to clarify the distinction between employees performing substantial and independent financial work and employees who merely sold financial products.

Opinion letters issued by the Department of Labor similarly recognize a variance in the types of work performed by employees within the financial industry, and explain why some financial employees are administrative while some perform production

9

functions. In 2001, the Department stated that a loan officer who was responsible for creating a loan package to meet the goals of a borrower by "select[ing] from a wide range of loan packages in order to properly advise the client, . . . supervis[ing] the processing of the transaction to closing," and "acquir[ing] a full understanding of the customer's credit history and financial goals in order to advise them regarding the selection of a loan package that will fit their needs and ability" performed administrative work, although the opinion letter ultimately concluded that such loan officers were not exempt. Dep't of Labor, Wage & Hour Div., Op. Letter (Feb. 16, 2001), available at 2001 WL 1558764.

Crucially, the 2001 opinion letter clarified an opinion letter issued in 1999 after the Department received more information about the loan officer's duties. In 1999, the Department understood loan officers to develop new business for their employer, consult with borrowers to obtain the best possible loan package, work with a number of different lenders to select loan programs, and perform assorted services shepherding the loan to completion. See Dep't of Labor, Wage & Hour Div., Op. Letter (May 17, 1999), available at 1999 WL 1002401. With that understanding of the loan officers' duties, the Department concluded that the loan officers were "engaged in carrying out the employer's day-to-day activities rather than in determining the overall course and policies of the business" and were therefore not employed as administrative employees. See id. While the 2001 letter reconsidered the loan officers' employment and reached a different

10

conclusion, the later letter noted that the reconsideration was "in light of the advisory duties [loan officers] perform on behalf of their employer's customers," which the employer clarified were the "primary duty" of a loan officer. See 2001 WL 1558764. The two letters read together thus provide a helpful point of reference, highlighting the importance of advisory duties as opposed to mere loan sales.

We thus turn to the job of underwriter at Chase to assess whether Whalen performed day-to-day sales activities or more substantial advisory duties. As an underwriter, Whalen's primary duty was to sell loan products under the detailed directions of the Credit Guide. There is no indication that underwriters were expected to advise customers as to what loan products best met their needs and abilities. Underwriters were given a loan application and followed procedures specified in the Credit Guide in order to produce a yes or no decision. Their work is not related either to setting "management policies" nor to "general business operations" such as human relations or advertising, 29 C.F.R. § 541.2, but rather concerns the "production" of loans – the fundamental service provided by the bank.

Chase itself provided several indications that they understood underwriters to be engaged in production work. Chase employees referred to the work performed by underwriters as "production work." Within Chase, departments were at least informally categorized as "operations" or "production," with underwriters encompassed by the

11

production label. Underwriters were evaluated not by whether loans they approved were paid back, but by measuring each underwriter's productivity in terms of "average of total actions per day" and by assessing whether the underwriters' decisions met the Chase credit guide standards.

Underwriters were occasionally paid incentives to increase production, based on factors such as the number of decisions underwriters made. While being able to quantify a worker's productivity in literal numbers of items produced is not a requirement of being engaged in production work, it illustrates the concerns that motivated the FLSA. The overtime requirements of the FLSA were meant to apply financial pressure to "spread employment to avoid the extra wage" and to assure workers "additional pay to compensate them for the burden of a workweek beyond the hours fixed in the act." Overnight Motor Transp. Co., Inc. v. Missel, 316 U.S. 572, 577-78 (1942), superseded by statute, Portal-to-Portal Pay Act of 1947, ch. 52, 61 Stat. 84 (granting courts authority to deny or limit liquidated damages awarded for violations of the FLSA). While in the abstract any work can be spread, there is a relatively direct correlation between hours worked and materials produced in the case of a production worker that does not exist as to administrative employees. Paying production incentives to underwriters shows that Chase believed that the work of underwriters could be quantified in a way that the work of administrative employees generally cannot.

12

We conclude that the job of underwriter as it was performed at Chase falls under the category of production rather than of administrative work. Underwriters at Chase performed work that was primarily functional rather than conceptual. They were not at the heart of the company's business operations. They had no involvement in determining the future strategy or direction of the business, nor did they perform any other function that in any way related to the business's overall efficiency or mode of operation. It is undisputed that the underwriters played no role in the establishment of Chase's credit policy. Rather, they were trained only to apply the credit policy as they found it, as it was articulated to them through the detailed Credit Guide.

Furthermore, we have drawn an important distinction between employees directly producing the good or service that is the primary output of a business and employees performing general administrative work applicable to the running of any business. In Reich, for example, BCI Investigators "produced" law enforcement investigations. By contrast, administrative functions such as management of employees through a human resources department or supervising a business's internal financial activities through the accounting department are functions that must be performed no matter what the business produces. For this reason, the fact that Whalen assessed creditworthiness is not enough to determine whether his job was administrative. The context of a job function matters: a clothing store accountant deciding whether to issue a credit card to a consumer performs a

13

support function auxiliary to the department store's primary function of selling clothes. An underwriter for Chase, by contrast, is directly engaged in creating the "goods" – loans and other financial services – produced and sold by Chase.

This conclusion is also supported by persuasive decisions of our sister circuits. In Bratt v. County of Los Angeles, the Ninth Circuit held that the "essence" of an administrative job is that an administrative employee participates in "the running of a business, and not merely . . . the day-to-day carrying out of its affairs." 912 F.2d 1066, 1070 (9th Cir. 1990) (internal quotations omitted). The Department of Labor later quoted that same language approvingly. See Dep't of Labor, Wage & Hour Div., Op. Letter (Sept. 12, 1997), available at 1997 WL 971811. More recently, the Ninth Circuit expanded, "The administration/production distinction thus distinguishes between work related to the goods and services which constitute the business' marketplace offerings and work which contributes to 'running the business itself.'" Bothell v. Phase Metrics, Inc., 299 F.3d 1120, 1127 (9th Cir. 2002). The Third Circuit has also noted that production encompasses more than the manufacture of tangible goods. See Martin v. Cooper Elec. Supply Co., 940 F.2d 896, 903-04 (3d Cir. 1991). In that case, telephone salespersons were given a pricing matrix specifying price quotes for specific goods as offered to specific customers. The salespersons had some authority to deviate from the price quotes, and occasionally also called manufacturers to restock items, negotiating the price of

14

acquiring the item with the manufacturer. The salespersons were paid a fixed salary, but were also paid incentives tied to their sales performance. The Third Circuit held that the salespersons were production employees because the goal of the salespersons was "to *produce* wholesale sales." Id. at 903 (emphasis in original). Along similar lines, the First Circuit held that marketing representatives charged with cultivating and supervising an independent sales force were exempt administrative employees, as their primary duties of educating and organizing salespeople were "aimed at promoting . . . customer sales *generally*," not "routine selling efforts focused simply on particular sales transactions." Reich v. John Alden Life Ins. Co., 126 F.3d at 10 (emphasis in original).

A number of district court opinions have drawn a similar distinction. See, e.g., Neary v. Metro. Prop. & Cas. Ins. Co., 517 F. Supp. 2d 606, 614 (D. Conn. 2007) (finding that a claims adjuster did not perform administrative work because he did not perform "duties clearly related to servicing the business itself: it could not function properly without employees to maintain it; a business must pay its taxes and keep up its insurance. Such are not activities that involve what the day-to-day business specifically sells or provides, rather these are tasks that every business must undertake in order to function."); Relyea v. Carman, Callahan & Ingham, LLP, No. 03 Civ. 5580(DRH)(MLO), 2006 WL 2577829, at *5 (E.D.N.Y. 2006) ("Like [escrow] closers . . . , Plaintiffs applied existing policies and procedures on a case-by-case basis. Their duties do not involve the crafting

15

of those policies, but rather the application of those policies. As a result, Plaintiffs are better described as 'production,' rather than 'administrative' workers, and they are not exempt from FLSA."); Casas, 2002 WL 507059, at *9 (finding that loan originators for a finance company who were "responsible for soliciting, selling and processing loans as well as identifying, modifying and structuring the loan to fit a customer's financial needs" were "primarily involved with 'the day-to-day carrying out of the business' rather than 'the running of [the] business [itself]' or determining its overall course or policies" (quoting Bratt, 912 F.2d at 1070)); Reich v. Chi. Title Ins. Co., 853 F. Supp. 1325, 1330 (D. Kan. 1994) (finding escrow closers employed by a company engaged in the business of insuring title for real property to be engaged in a production rather than administrative capacity).

Other out-of-circuit cases similarly support the logic that context matters. An employee whose job is to evaluate credit who works in the credit industry is more likely to perform a production job. See Casas, 2002 WL 507059, at *9 (loan officers for bank are production); Relyea, 2006 WL 2577829, at *5 (loan closers are production); Reich v. Chi. Title Ins. Co., 853 F. Supp. at 1330. Employees who evaluate and extend credit on behalf of a company that is not in the credit industry – extending credit in order to allow customers to purchase a tangible good that the employer manufactured, for example – are generally considered administrative employees. See Hills v. W. Paper Co., 825 F. Supp.

16

936 (D. Kan. 1993) (employee extended credit to customers of company manufacturing paper); Reich v. Haemonetics, 907 F. Supp. 512 (D. Mass. 1995) (employee involved in extending credit to customers of company that sold equipment to hospitals). But in the context of such businesses, such employees provide adjunct, general services to the overall running of the business, while at Chase, underwriters such as Whalen are the workers who produce the services – loans – that are "sold" by the business to produce its income.

Chase offers a few out of circuit cases suggesting that underwriters are exempt administrative employees, but the cases are distinguishable on their facts. See, e.g., Edwards v. Audobon Ins. Group Co., No. 3:02-CV-1618-WS, 2004 WL 3119911, at *5 (S.D. Miss. Aug. 31, 2004) (finding an underwriter who "decide[d] what risks the company would take and at what price" an exempt administrative employee); Callahan v. Bancorpsouth Ins. Servs. of Miss., Inc., 244 F. Supp. 2d 678, 685-86 (S.D. Miss. 2002) (finding manager responsible for overseeing all aspects of employer's operations, including marketing, billing and collections, and underwriting, was administrative employee); Hippen v. First Nat'l Bank, Civ. A. No. 90-2024-L, 1992 WL 73554, at *7 (D. Kan. Mar. 19, 1992) (finding executive vice president of bank who described himself as "number two" in hierarchy and was member of board of directors to be administrative employee); Creese v. Wash. Mut. Bank, No. B193931, 2008 WL 650766, at *8 (Cal. Ct.

App. 2008) (noting specifically that lower court determination as to class certification did not address the merits of whether underwriters seeking to challenge exempt classification were administrative employees). In virtually all of these cases, the employee in question exercised managerial tasks beyond assessing credit risk, or assessed risks in a firm whose primary business was not the extension of credit, and the result is therefore not in tension with the analysis offered here. In any event, to the extent that the reasoning, language, or result in any of these cases is not consistent with our analysis, we respectfully disagree.

Accordingly, we hold that Whalen did not perform work directly related to management policies or general business operations. Because an administrative employee must *both* perform work directly related to management policies or general business operations *and* customarily and regularly exercise discretion and independent judgment, we thus hold that Whalen was not employed in a bona fide administrative capacity. We need not address whether Whalen customarily and regularly exercised discretion and independent judgment.

The judgment of the district court in favor of the appellee is REVERSED.