RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 16a0053p.06

# UNITED STATES COURT OF APPEALS

### FOR THE SIXTH CIRCUIT

_____

GREGORY LUTZ; DOROTHY BECKER,

                  *Plaintiffs-Appellants,*

     *v.*

HUNTINGTON BANCSHARES, INC.; HUNTINGTON NATIONAL BANK,

                  *Defendants-Appellees.*

> No. 14-3727

Appeal from the United States District Court
for the Southern District of Ohio at Columbus.
No. 2:12-cv-01091—Gregory L. Frost, District Judge.

Argued: April 29, 2015

Decided and Filed: March 2, 2016

Before: BOGGS, SUHRHEINRICH, and WHITE, Circuit Judges.

_____

### COUNSEL

**ARGUED:** Michael J. Lingle, THOMAS & SOLOMON LLP, Rochester, New York, for Appellants. Tracy S. Pyles, LITTLER MENDELSON, P.C., Columbus, Ohio, for Appellees. **ON BRIEF:** Michael J. Lingle, J. Nelson Thomas, THOMAS & SOLOMON LLP, Rochester, New York, for Appellants. Tracy S. Pyles, Kaila M. Krausz, LITTLER MENDELSON, P.C., Columbus, Ohio, Andrew J. Voss, LITTLER MENDELSON, P.C., Minneapolis, Minnesota, for Appellees.

     SUHRHEINRICH, J., delivered the opinion of the court in which BOGGS, J., joined. WHITE, J. (pp. 15–18), delivered a separate dissenting opinion.

---

**OPINION**

---

SUHRHEINRICH, Circuit Judge.  Gregory Lutz and Dorothy Becker ("Plaintiffs") filed a class-action suit against their former employer, Huntington Bancshares, Inc. and Huntington National Bank (collectively, "Huntington" or "the Bank"), alleging that the Bank failed to pay overtime compensation as required by the Fair Labor Standards Act ("FLSA"), 29 U.S.C. §§ 201-219.  Plaintiffs moved to conditionally certify a class of all current and former employees whose primary job duty consisted of "underwriting," or "providing [Huntington's] credit products to customers after reviewing and evaluating the loan applications against [the Bank's] credit standards and guidelines that governed when to provide those credit products to those customers."  The district court certified a smaller class of underwriters—those who worked with residential-loan products.  The issue in this case is whether residential-loan underwriters are administrative employees under the FLSA, 29 U.S.C. § 213(a)(1), and thus not entitled to overtime pay under 29 U.S.C. § 207(a)(1).

The district court sided with Huntington, ruling that the underwriters were administrative employees within the meaning of 29 U.S.C. § 213(a)(1) and 29 C.F.R. § 541.200(a), and therefore exempt from the overtime-pay provisions because their job duties related to the general business operations of the Bank, and they exercised discretion and independent judgment when performing those duties.

For the following reasons, we affirm.

**I.**

While Huntington offers a number of financial products to the public, we are concerned only with residential loans.  The loan process begins with the creation of a loan product, such as a thirty-year fixed-rate mortgage or a particular type of adjustable-rate mortgage, and it ends when an underwriter approves or denies a loan for a customer.  First, Huntington's Product Development Group designs a loan product and develops its profile.  The profile assesses Huntington's risk appetite for a particular product and establishes guidelines, such as the

maximum loan-to-value or debt-to-income the Bank will accept from a customer. The Secondary Marketing Group then sets the interest rate for that product.

An employee known as a loan originator meets with an interested customer and discusses the advantages, disadvantages, and risks of various loan products. The loan originator selects the loan that best fits the customer's needs and begins the application process. A loan processor, another employee, then works with the loan originator or customer to ensure that all of the required documentation is included in the application file. This material includes a credit report, income documentation, asset documentation, the purchase contract, and a title search or report commitment on the product. For most loan applications, that information is uploaded onto an underwriting software program provided by Huntington, and the software generates an electronic file.

Once the application file is complete, an underwriter reviews it. Underwriters perform two functions. First, underwriters confirm that the information provided in the application is accurate. For instance, underwriters use cash-flow analysis and pay-stub calculation worksheets to calculate the applicant's income. Underwriters also compare the information provided in the application to a credit-bureau report.

Second, underwriters decide whether the customer qualifies for the desired loan. When an underwriter electronically receives an application, the underwriting software initially recommends whether to approve or deny the loan. Underwriters essentially review that recommendation. To do this, the underwriter applies the Bank's guidelines ("the Guidelines") and lending criteria, as well as any pertinent regulations, to determine whether the loan would fall within Huntington's acceptable level of risk. The Guidelines, which span thousands of pages, are written manuals, policies, and procedures that catalogue the factors an underwriter must consider in order to determine whether a customer is eligible for a particular loan.

Underwriters, after careful review of a customer's application, apply the Guidelines. For instance, based on the loan product sought and the customer's risk categorization, an underwriter will calculate a customer's loan-to-value and debt-to-income ratios and then determine whether those ratios fall under the maximum values prescribed for approval by the Guidelines. Thus, in

general, the Guidelines ensure that similarly-situated customers are treated equally. Indeed, underwriters are "expected to exercise their judgment regarding credit decisions objectively."

An underwriter may at his or her discretion take actions beyond the Guidelines. Sometimes, the Guidelines expressly give the underwriter a choice among options. Other times, the Guidelines are silent and the underwriter must rely on personal experience or judgment to make a decision. First, Huntington provides a checklist of "stipulations" that a customer must satisfy in order to gain approval for a loan, such as paying off a delinquent credit card or a lien. But an underwriter's discretion may go beyond that list and add unspecified requirements. These additional stipulations are added as a safeguard for the loan.

Second, if a customer does not meet the Bank's lending criteria, but otherwise satisfies certain compensating factors, an underwriter may, at his or her discretion, approve the loan. This is known as an "exception" or "adjustment." As provided in the Guidelines, such compensating factors include: a previous credit history with Huntington, securing the loan with a liquid account at Huntington, or having a co-signer on the note.

Third, an underwriter may make a "counteroffer" that alters the original application. For example, if a customer does not qualify for the desired loan, the underwriter may recommend another type of loan for which the customer would qualify. If an underwriter makes a counteroffer, a loan processor or loan originator works with the customer to decide whether the counteroffer is acceptable to the customer. The authority to grant a counteroffer does not appear in the Guidelines. Instead, it is left to the underwriter to use his or her judgment and experience.

Fourth, an underwriter may "flag" an application that falls within the Guidelines if the loan appears suspicious or contrary to the customer's interests. For instance, if an elderly customer attempts to trade a two-year mortgage for a thirty-year mortgage, the underwriter would ensure that the customer understood the request before approving the loan. The decision to flag an application is also based on judgment and experience, rather than the direction of the Guidelines.

The loan process ends when, after consulting the Guidelines and exercising judgment, an underwriter either approves the loan or denies the application. If the underwriter approves the

loan, it goes into a final processing phase, during which the loan processor will coordinate with the customer and the title company to schedule the closing.

After completing discovery, Plaintiffs and Huntington each filed motions for summary judgment. In granting Huntington's motion for summary judgment and denying Plaintiff's motion, the district court reasoned that underwriters performed administrative work because they did not actually create or sell Huntington's loan products. The court also analogized the work of underwriters to examples of administrative work provided in the Department of Labor ("DOL") regulations, including that of insurance claims adjusters, financial analysts, quality-control officers, and legal/regulatory compliance officers. The court further reasoned that underwriters exercise discretion and independent judgment in applying or deviating from the Guidelines. This appeal followed.

**II.**

The court reviews a grant or denial of a motion for summary judgment *de novo*. *Stephenson v. Allstate Ins. Co.*, 328 F.3d 822, 826 (6th Cir. 2003). "Summary judgment is appropriate if, examining the record and drawing all inferences in a light most favorable to the non-moving party, there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." *Schaefer v. Ind. Mich. Power Co.*, 358 F.3d 394, 399 (6th Cir. 2004).

The FLSA requires employers to pay their employees overtime for work performed in excess of forty hours per week. 29 U.S.C. § 207(a)(1). But this provision does not apply to individuals "employed in a bona fide . . . administrative . . . capacity." 29 U.S.C. § 213(a)(1). An employee working in a "bona fide administrative capacity" is someone:

> (1) Compensated on a salary or fee basis at a rate of not less than $455 per week . . . ;
>
> (2) Whose primary duty is the performance of office or non-manual work directly related to the management or general business operations of the employer or the employer's customers; *and*
>
> (3) Whose primary duty includes the exercise of discretion and independent judgment with respect to matters of significance.

29 C.F.R. § 541.200(a) (emphasis added); *see also Foster v. Nationwide Mut. Ins. Co.*, 710 F.3d 640, 642 (6th Cir. 2013).

An employee who satisfies all three elements falls within this "administrative exemption." *See Renfro v. Ind. Mich. Power Co.*, 497 F.3d 573, 576 ("*Renfro II*") (6th Cir. 2007) (holding that an employer must establish all three elements of the defense with regard to its employees in order to prevail). Although the parties do not dispute that underwriters satisfy the first element of the exemption, Plaintiffs contend that underwriters do not satisfy the second and third elements. The burden is on the employer to prove each element of the exemption by a preponderance of the evidence. *Foster*, 710 F.3d at 642. In other words, Huntington can prevail only by providing evidence that creates, at the very least, a genuine issue of material fact as to whether underwriters meet all of the elements. If the Bank cannot satisfy its burden, the court must deny its motion for summary judgment and grant Plaintiffs' motion for summary judgment. *Martin v. Ind. Mich. Power Co.*, 381 F.3d 574, 578 (6th Cir. 2004). Moreover, the administrative exemption is "to be narrowly construed against the employer[] seeking to assert [it]." *Id.* (quoting *Douglas v. Argo-Tech Corp.*, 113 F.3d 67, 70 (6th Cir. 1997) (internal quotation marks omitted)).

### A. Directly Related to Management or General Business Operations

To fall within the administrative exemption, an underwriter's work must "directly relate[] to the management or general business operations of [Huntington] or [the Bank's] customers," 29 C.F.R. § 541.200(a)(2), and that work must be an underwriter's "primary duty." 29 C.F.R. § 541.201(c).

To determine whether an underwriter's work directly relates to management or general business operations, we apply an "administrative-production dichotomy." *Foster*, 710 F.3d at 644. The DOL regulations define administrative employees as those who "perform work directly related to assisting with the running or servicing of the business, as distinguished, for example, from working on a manufacturing production line or selling a product in a retail or service establishment." 29 C.F.R. § 541.201(a). The work of an administrative employee is thus considered "ancillary to an employer's principal production activity." *Renfro v. Ind. Mich.*

*Power Co.*, 370 F.3d 512, 517 (6th Cir. 2004) ("*Renfro I*") (citation omitted). Huntington's underwriters perform administrative work because they assist in the running and servicing of the Bank's business by making decisions about when Huntington should take on certain kinds of credit risk, something that is ancillary to the Bank's principal production activity of selling loans.

Two Sixth Circuit cases dictate this result: *Renfro I* and *Foster*. In *Renfro I*, the plaintiffs were "planners" who worked for Indiana Michigan Power Company, doing business as American Electric Power ("AEP"), a business that operated several power plants. 370 F.3d at 515. Planners took job orders, identified maintenance or new construction work, and then created work packages that the power plant's craft workers would use in the field. *Id.* AEP classified these employees as exempt from overtime. *Id.* The planner plaintiffs argued that their work was not administrative, but rather a maintenance function best classified as production.[1] *Id.* at 517. The Sixth Circuit rejected this argument. We determined that the planners' primary job—creating plans for maintaining equipment and systems in power plants—was "ancillary" to AEP's principal production activity: generating electricity. *Id.* at 518. Instead, such duties constituted "the type of 'servicing' ('advising the management, planning,' etc.) that the FLSA deems administrative work directly related to AEP's general business operations." *Id.* (quoting 29 C.F.R. § 541.205(b)).

Huntington's underwriters perform a similar servicing function as the *Renfro I* planners. By creating maintenance plans for the power plants, the planners may have contributed to their business's principal production activity of generating electricity, but their role was better conceptualized as servicing the power plant by advising the company on how to make repairs. Here, while the underwriters' duties touch on Huntington's principal production activity of selling loans, the underwriters exist primarily to service the Bank by advising whether it should accept the credit risk posed by its customers.

---

[1] At the time *Renfro I* was decided, an older set of regulations was in place. The regulations, however, still reflected an administrative-production dichotomy. *See* 29 C.F.R. § 541.205(a) ("The phrase 'directly related to management policies or general business operations of his employer or his employer's customers' describes those types of activities relating to the administrative operations of a business as distinguished from 'production' or, in a retail or service establishment, 'sales' work."). Administrative work included "the work performed by so-called white-collar employees engaged in 'servicing' a business," such as "advising the management, planning, negotiating, representing the company, purchasing, promoting sales, and business research and control." 29 C.F.R. § 541.205(b).

In *Foster*, the Sixth Circuit considered whether special investigators ("SIs") who worked for Nationwide Mutual Insurance Company ("Nationwide") performed a job directly related to Nationwide's management or general business operations. SIs would investigate potentially fraudulent insurance claims, subject to "guidelines and strict auditing standards." *Foster*, 710 F.3d at 642. Concluding that "Nationwide is in the business of creating and marketing insurance policies to the public," the court applied the administrative-production dichotomy and determined that SIs could not be classified as production employees because they did not write or sell insurance policies—Nationwide's product. *Id.* at 645. Instead, the "SIs' investigative work that drives the claims adjusting decisions with respect to suspicious claims is also directly related to assisting with the servicing of Nationwide's business." *Id.* at 646.

In arriving at that decision, the Sixth Circuit analogized the work of SIs to that of insurance claims adjusters, whom the DOL regulations identify as examples of administrative employees. *Id.* at 645. Insurance claims adjusters "generally meet the duties requirements for the administrative exemption . . . if their duties include activities such as interviewing insureds, witnesses and physicians; inspecting property damage; reviewing factual information to prepare damage estimates; [and] evaluating and making recommendations regarding coverage of claims . . . ." 29 C.F.R. § 541.203(a). The *Foster* court determined that "the SIs' work remains integral to the claims adjusting function, is performed in partnership with the [claims adjusters], and involves making findings that bear directly on the [claims adjusters'] decisions to pay or deny a claim." 710 F.3d at 646.

The work of Huntington's underwriters is similar to that of SIs and insurance claims adjusters in two ways. First, neither an underwriter nor an SI/claims adjuster generates business for his or her employer by directly selling a product. For the SI/claims adjuster, the insurance policy has already been sold to a customer, and the SI/claims adjuster "services" the insurance company by investigating a claim or determining whether to pay out a premium. For the underwriter, the customer has already consulted with a loan originator and selected a loan product, and the underwriter services the Bank by advising Huntington on whether it should accept the credit risk posed by a customer. As the district court concluded, "both Plaintiffs and insurance claims adjusters provide a service that does not generate business for their employers,

but is necessary for their employers to do business." Second, both underwriters and SIs/claims adjusters broadly perform an investigative function. Just as SIs/claims adjusters receive a claim for insurance benefits and consider the facts surrounding the claim to ascertain whether the claim falls within the terms of coverage, underwriters receive a loan application and evaluate the facts surrounding the application to determine whether the Bank should accept the risk.

The job duties of Huntington's underwriters also resemble those duties of administratively exempt employees in the financial-services industry.[2] An employee in the financial-services industry is administrative "if [his or her] duties include work such as collecting and analyzing information regarding the customer's income, assets, investments or debts" and "determining which financial products best meet the customer's needs and financial circumstances." 29 C.F.R. § 541.203(b). Underwriters perform both of these functions. Underwriters collect and analyze customer financial information in two ways. First, underwriters use various tools, such as income-calculation and cash-flow analysis worksheets, to verify the customer information provided in a loan application. Second, underwriters look at the financial information provided by a customer in order to determine whether to approve or deny a loan. For example, an underwriter must assess whether a customer satisfies the maximum loan-to-value and debt-to-income ratios authorized by the Guidelines, based on the customer's risk categorization and the loan sought. And underwriters determine which financial products best meet a customer's needs and financial circumstances when exercising discretion to go beyond the Guidelines. For instance, if an underwriter recognizes that a customer does not meet the Guidelines for a particular loan but does meet the Guidelines for an alternative product, the underwriter can make a "counteroffer" recommending that alternative loan. Similarly, if a loan

---

[2]The dissent cites a 2010 opinion letter from the Administrator of the Department of Labor Wage and Hour Division finding that mortgage loan officers are non-exempt and making clear that the financial-services industry example does not create an alternative standard for the administrative exemption for employees in the financial-services industry. *See* Administrator's Opinion Letter Fair Labor Standards Act, 2010 WL 1822423 (Dep't of Labor Mar. 24, 2010). There the Administrator concluded that mortgage loan officers, whose "primary duty is making sales," performed the production work of their employers, i.e. the selling of loan products. *Id.* at *7.

The job duties of Huntington's underwriters, which include collecting and analyzing information of loan customers and advisors the Bank whether they are a safe credit risk, are not comparable to the "typical job duties of mortgage loan officers" addressed in the opinion letter, which consist primarily of "making sales." Huntington underwriters' primary duties involve service to the Bank and not to customers. Thus, the 2010 opinion letter does not offer meaningful guidance in this case.

appears suspicious or contrary to the customer's interests, the underwriter may "flag" the application and prevent approval even if the customer is within the Guidelines.

Plaintiffs contend that the Second Circuit's decision in *Davis v. J.P. Morgan Chase & Co.*, 587 F.3d 529 (2d Cir. 2009), is on point. In that case, loan underwriters working for J.P. Morgan Chase ("Chase") challenged the company's classification of underwriters as exempt from the FLSA overtime requirement. *Id.* at 531. The Second Circuit agreed, concluding that the underwriters were production employees. *Id.* at 535. The court held that the underwriters' work was "not related either to setting 'management policies' nor to 'general business operations' such as human relations or advertising, but rather concerns the 'production' of loans—the fundamental service provided by the bank." *Id.* at 534 (citation omitted). It emphasized that the underwriters "had no involvement in determining the future strategy or direction of the business, nor did they perform any other function that in any way related to the business's overall efficiency or mode of operation." *Id.* at 535. Underwriters were instead "trained only to apply the credit policy as they found it, as it was articulated to them through the detailed Credit Guide." *Id.*

While *Davis* is factually similar, the district court properly rejected the case's applicability, concluding that it is inconsistent with the precedent of this circuit. In this circuit, the focus is on whether an employee helps run or service a business—not whether that employee's duties merely touch on a production activity. Like the plaintiffs in *Renfro I* and *Foster*, underwriters perform work that services the Bank's business, something ancillary to Huntington's principal production activity. Furthermore, the job duties performed by underwriters resemble those duties performed by positions deemed administrative by the DOL regulations, including claims adjusters and employees in the financial-services industry. In fact, because the *Davis* court applied an older set of regulations, it failed to compare underwriters to claims adjusters or employees in the financial-services industry. Finally, because the underwriters in *Davis* were trained only to apply Chase's credit policy "as they found it," *id.*, *Davis* is factually distinguishable from the instant case because Huntington's underwriters exercise considerable discretion in applying the Bank's Guidelines.

Accordingly, Huntington's underwriters perform work that falls within the administrative exemption. The Bank therefore meets its burden concerning the second element of the administrative exemption. This leaves the third element of the exemption.

## B. Exercise of Discretion and Independent Judgment

In order to be exempt due to status as an administrator, an employee's work must also "include[] the exercise of discretion and independent judgment with respect to matters of significance." 29 C.F.R. § 541.200(a)(3). Exercising discretion and independent judgment involves "the comparison and the evaluation of possible courses of conduct, and acting or making a decision after the various possibilities have been considered." 29 C.F.R. § 541.202(a). An employee exercising discretion and independent judgment "has authority to make an independent choice, free from immediate direction or supervision," although employees whose decisions are ultimately reviewable can still exercise discretion and independent judgment. 29 C.F.R. § 541.202(c).

In concluding that underwriters exercise discretion and independent judgment, the district court noted that "[t]he fact that the Bank even needs human underwriters—in addition to software programs—suggests that the decisions at issue are more than just mechanical calculations." Second, the court emphasized that while the underwriters' authority was "heavily tempered" by the Guidelines, the underwriters still had authority to waive or deviate from the Guidelines in certain instances. Plaintiffs argue that the district court erred in its conclusion because underwriters are "required to adhere to guidelines and manuals which strip them of the ability to exercise discretion and independent judgment."

But as this court held in *Renfro II*, an employee who is directed by guidelines and manuals can still exercise discretion and independent judgment. *Renfro II* involved whether AEP's technical writers fell within the third element of the FLSA's administrative exemption. Technical writers supported the maintenance department at AEP's nuclear power plant, developing written procedures on how to maintain equipment. 497 F.3d at 574. Prior to drafting a procedure, a technical writer consulted numerous sources, including the vendor manual, technical specifications, Electric Power Research Institution ("EPRI") guides, Institute of

Nuclear Power Operators ("INPO") operating experiences, Nuclear Regulatory Commission ("NCR") bulletins, industry standards, and colleagues in other departments to determine how to maintain a particular piece of equipment. *Id.* at 574-75. A writer compared different ways to address a problem and picked a solution based on an assessment of the available information. *Id.* at 575. Exercising wide latitude, a writer then drafted a procedure incorporating that solution. *Id.* Although technical writers worked without direct supervision in drafting new procedures, they were guided by a manual on procedural writing that AEP developed. The manual essentially provided a writing template and standardized format and style, but it did not restrict the level of procedural detail a writer could apply. *Id.*

The technical writers argued that they did not exercise discretion and independent judgment because AEP had "rigid" procedures for how to craft maintenance procedures. *Id.* at 577. The Sixth Circuit held that neither the technical manual nor the daily realities of the writers' work environment eliminated the use of their discretion. *Id.* Speaking of technical writers, the court noted:

> Their job requires them to create a clear and understandable set of highly technical instructions for maintaining the electrical and mechanical systems of a particular piece of equipment. Looking to various source materials for some of the technical information and using a computer to aid research and recommendations does not detract from the import of the discretion and independent judgment exercised. Channeling discretion through a manual on procedure writing does not eliminate the existence of that discretion.

*Id.* The court emphasized that the manual was not "an encyclopedia of strict requirements." *Id.* It did not answer substantive questions that could arise during the research, analysis, or development of a procedure, and it did not restrict the technical content of the instructions. *Id.* The manual merely outlined various items for the writer's consideration and recommended optional "checks" to ensure the feasibility of a completed procedure. *Id.* Indeed, "two different writers may solve the same problem two different ways, even though both solutions are equally effective." *Id.*

Just as the writing manual in *Renfro II* did not establish strict requirements that eliminated a writer's ability to exercise discretion and independent judgment, Huntington's Guidelines do not prevent its underwriters from acting outside its parameters. By imposing

stipulations, creating exceptions, proposing counteroffers, and flagging applications, underwriters exercise independent judgment to depart from a straight approval or denial of a loan application based solely on the Guidelines.

Plaintiffs argue that they are analogous to the shift lieutenants in *Ale v. Tenn. Valley Authority*, 269 F.3d 680 (6th Cir. 2001). In *Ale*, the lower court held that those shift lieutenants were not covered by the FLSA's administrative exemption and were therefore entitled to overtime pay because nearly every decision a shift lieutenant made was governed by an order, rule, or regulation. *Id.* at 686-87. The lower court further held that the shift lieutenants did not fall within the "executive" exemption to the FLSA because their primary duty was not management. *Id.* at 687; *see also* 29 U.S.C. § 213(a)(1) (exempting "any employee employed in a bona fide executive . . . capacity" from overtime pay requirements). However, this court on appeal affirmed solely on the basis of the lower court's executive exemption ruling and did not address the administrative exemption or the exercise of discretion and independent judgment. *Ale*, 269 F.3d at 692. Accordingly, *Ale* has only the persuasive force of the district court opinion.

Finally, this exercise of discretion and independent judgment must also concern "matters of significance," or the "level of importance or consequence of the work performed." 29 C.F.R. § 541.202(a). "[T]he work itself . . . must be of substantial importance—not the size of the consequences or loss that may result from improper performance of the employee's duties." *Martin*, 381 F.3d at 583.

Plaintiffs contend that underwriters do not exercise discretion and independent judgment concerning matters of significance because the underwriters do not bear any responsibility for financial loss and do not determine the financial risk that Huntington will take for any given loan. However, while underwriters do not determine Huntington's *overall* risk guidelines, they still make decisions that significantly impact the business and *do* determine the risk Huntington will accept for any particular loan. Underwriters can approve loans between $250,000 and $1,000,000. Their approval of a loan binds Huntington to that risk, and their denial of an application prevents a customer from acquiring credit. *Cf* (holding that the analogous predecessor regulation to 29 C.F.R. § 541.202(a) did not encompass an employee who made "no

decisions that affect even the small segment of the company's operations in which his work is performed").

Therefore, Huntington's underwriters satisfy the third element of the administrative exemption.

**III**.

For the foregoing reasons, we **AFFIRM** the decision of the district court in all respects.

———————————

**DISSENT**

———————————

HELENE N. WHITE, Circuit Judge, dissenting.  I respectfully dissent.  Defendants have not shown that Plaintiffs fall within the administrative exemption as a matter of law, and that Defendants are thus entitled to summary judgment.  The record supports that there are genuine issues of fact regarding whether Plaintiffs' primary duty[1] as Home Lending Underwriters (HLUs) "includes the exercise of discretion and independent judgment with respect to matters of significance," the third element of the administrative exemption.  29 C.F.R. § 541.200(a)(3).

HLUs make no holistic decisions; rather, like loan originators and processors, they are links in a chain that culminates in delivering loan products to the bank's customers.  The exercise of discretion and independent judgment "involves the comparison and the evaluation of possible courses of conduct, and acting or making a decision after the various possibilities have been considered," 29 C.F.R. § 541.202(a), and "must be more than the use of skill in applying well-established techniques, procedures or specific standards described in manuals or other sources," *id.* § 541.202(e).  Unlike the insurance adjusters cited by the majority, who exercise discretion by "evaluating and making recommendations regarding coverage of claims; determining liability and total value of a claim; negotiating settlements; and making recommendations regarding litigation," *see* 29 C.F.R. § 541.203(a), HLUs make no such independent discretionary decisions.  Rather, HLUs must follow Defendants' very explicit and detailed manuals and guidelines.  PID 842, 874, 880, 959, 983, 997, 1629.  Defendant Huntington National Bank's Vice President Mary Cline testified that HLUs can approve a loan "with conditions," but that simply means that

———————————

[1] The term "Primary Duty"

> means the principal, main, major or most important duty that the employee performs.  Determination of an employee's primary duty must be based on all the facts in a particular case, with the major emphasis on the character of the employee's job as a whole.  Factors to consider when determining the primary duty of an employee include, but are not limited to, the relative importance of the exempt duties as compared with other types of duties; the amount of time spent performing exempt work; the employee's relative freedom from direct supervision; and the relationship between the employee's salary and the wages paid to other employees for the kind of nonexempt work performed by the employee.

29 C.F.R. § 541.700(a).

"there's additional information that the underwriter will still need," and the "conditions" are relayed to the loan processor, who collects the information and forwards it to the underwriter. Defendants have not shown that HLUs exercise discretion in determining whether to approve loans, with or without conditions.

The majority asserts that HLUs' decisions "significantly impact the business and *do* determine the risk Huntington will accept for any particular loan." Maj. Op. at 13. I disagree. HLUs do not balance risk against security. The Product Development Group develops the various loan products and determines the risk level for each loan product, not HLUs. PID 891, 953–54. Moreover, loans cleared by HLUs are subject to independent review by two separate groups: the Pre-fund Audit Group and the Post-closing Quality Review Group. PID 911–12, 962–63.

The majority also concludes that HLUs exercise discretion and independent judgment concerning "matters of significance" because HLUs can approve loans of between $250,000 and $1,000,000. But all of the risk decisions are made elsewhere. And, tellingly, Defendants do not track the loans each HLU has approved or hold HLUs accountable when loans they approved default. PID 998–1001. Rather, Defendants' monthly review of HLUs is based on a *production number* calculated for each HLU based on the types of loan and review activities the particular HLU performs. PID 897–98, 906–08, 915. Because HLUs are evaluated based on the number of files reviewed, and the default rates of loans they approve are not even tracked, much less used as a basis of performance evaluations, a reasonable fact finder would likely infer that HLUs do not exercise discretion and independent judgment concerning "matters of significance."

The majority notes that "[t]he authority to grant a counteroffer does not appear in the Guidelines. Instead, it is left to the underwriter to use his or her judgment and experience." Maj. Op. at 4. However, according to Cline, HLUs lack authority to communicate a counteroffer to the loan processor and originator unless the customer meets all requirements for the loan being "counteroffered." That is, counteroffers involve no discretion; HLUs simply determine whether the customer meets the requirements of an alternative loan under Defendants' policies and manuals. PID 880–88.

Finally, although the majority accurately observes that in the 2004 regulations, 29 C.F.R. § 541.203(b)[2] lists financial-services-industry employees as an example of employees who are usually exempt, Maj. Op. at 9, the Administrator of the Department of Labor Wage and Hour Division issued an opinion letter in 2010 finding mortgage-loan officers, who admittedly have more of a sales role than the HLUs, non-exempt, in which the Administrator makes clear that the financial-services-industry example in § 541.203(b) does not

> create[] an alternative standard for the administrative exemption for employees in the financial services industry . . . . Contrary to the assumption in [the Administrator] Opinion Letter FLSA 2006-31, the administrative exemption is only applicable to employees that meet the requirements set forth in 29 C.F.R. § 541.200 . . . . The fact example at 29 C.F.R. § 541.203(b) is not an alternative test, and its guidance cannot result in it "swallowing" the requirements of 29 C.F.R. § 541.200.

*See* Administrator's Opinion Letter Fair Labor Standards Act, 2010 WL 1822423 (Dep't of Labor Mar. 24, 2010)[3] (approved in *Perez v. Mortgage Bankers Assoc.*, 135 S. Ct. 1199, 1206–07, 09 (2014)).

---

[2] 29 C.F.R. § 541.203(b) states:

Employees in the financial services industry generally meet the duties requirements for the administrative exemption if their duties include work such as collecting and analyzing information regarding the customer's income, assets, investments, or debts; determining which financial products best meet the customer's needs and financial circumstances; advising the customer regarding the advantages and disadvantages of different financial products; and marketing, servicing or promoting the employer's financial products. However, an employee whose primary duty is selling financial products does not qualify for the administrative exemption.

[3] The 2010 Administrator's Opinion Letter also discusses with approval two Sixth Circuit cases Plaintiffs rely on, *Martin v. Indiana Michigan Power Co.*, 381 F.3d 574 (6th Cir. 2004), and *Schaefer v. Indiana Michigan Power Co.*, 358 F.3d 394 (6th Cir. 2004):

Work does not qualify as administrative simply because it does not fall squarely on the production side of the line. As the court stated in *Martin v. Indiana Michigan Power Co.*, 381 F.3d 574, 582 (6th Cir. 2004), while production work cannot be administrative, there is no "absolute dichotomy under which all work must either be classified as production or administrative." The court rejected the company's argument that its information technology support specialists were administrative employees because they performed troubleshooting on computers on individual employees' desks and were not directly involved with the nuclear power plant equipment that "produced" electricity. Otherwise, the court asserted, employees such as "the janitorial staff, the security guards, the cooks in the cafeteria, and various other workers" would be viewed as doing administrative work. *Id.*; *see Schaefer v. Indiana Michigan Power Co.*, 358 F.3d 394, 402-03 (6th Cir. 2004) (employee who was primarily responsible for shipments of radioactive materials and waste away from the plant, setting up shipments with the transporter and waste management facility, determining the type of packaging to be used, preparing manifests, inspecting containers,

Further, "analysis" as used in § 541.203(b) does not contemplate the type of cabined analysis HLUs perform. HLUs determine whether the documentation submitted by the loan applicant and collected by the loan processor is accurate and meets the requirements set forth in Defendants' manuals and policies. In contrast, "analysis" in the financial services example referred to in § 541.203(b) involves evaluation of the information collected by weighing factors and making independent judgments, e.g., evaluating the source and predictability of the client's income, the client's present and future financial needs, and the client's investing experience and risk tolerance, and then suggesting investment products suitable to the client's profile. This type of analysis is not akin to analyzing credit information against a manual, which is what HLUs do.

I would reverse and remand for further proceedings.

---

etc., is not engaged in administrative work simply because he is engaged in an activity collateral to the principal business purpose of producing electricity; duties must be related to servicing the business itself to be administrative).

Administrator's Opinion Letter, 2010 WL 1822423, at *3.