Filed 5/27/16  Wilson v. Farmers Ins. Exchange CA2/3

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| AUDREY WILSON et al., | B260729 |
| Plaintiffs and Appellants, | (Los Angeles County Super. Ct. No. BC371597) |
| v. | |
| FARMERS INSURANCE EXCHANGE, | |
| Defendant and Respondent. | |

APPEAL from an order of the Superior Court of Los Angeles County, John Shepard Wiley, Judge.  Affirmed.

R. Rex Parris Law Firm, R. Rex Parris, Alexander R. Wheeler, Kitty Szeto, John M. Bickford; Altshuler Berzon, Michael Rubin and Peder J. Thoreen for Plaintiffs and Appellants.

Seyfarth Shaw, Andrew M. Paley, James M. Harris, Sheryl L. Skibbe and Kiran Aftab Seldon for Defendant and Respondent.

_____

# INTRODUCTION

Plaintiffs Audrey Wilson, Helene Diamond, and Connie Gilbert (Plaintiffs), former claims adjusters for defendant Farmers Insurance Exchange (Farmers), appeal from an order denying their motion for class certification. Plaintiffs allege that Farmers misclassified its claims adjusters as "exempt" employees under the "administrative exemption" to avoid paying overtime and other compensation required by the Labor Code. In their motion for class certification, Plaintiffs argued the misclassification claim could be resolved on a class basis because all of Farmers's claims adjusters performed the same primary job duties. The trial court denied the motion, finding the proposed class and subclasses lacked the requisite community of interest.

We affirm. An employee is exempt from overtime pay under the "administrative exemption" if, among other things, his or her job duties involve office or nonmanual work "*directly related* to management policies or general business operations of his/her employer or his employer's customers." (Cal. Code Regs., tit. 8, § 11040, subd. (1)(A)(2)(a)(I), italics added.)[1] To qualify as " 'directly related,' " the work must be both "*qualitatively* administrative"—that is, it must be among "the types of duties that constitute 'administrative operations of the business' "—and, "*quantitatively*, it must be of substantial importance to the management or operations of the business." (*Harris I, supra,* 53 Cal.4th at pp. 181, 188.) Plaintiffs assert their theory of recovery focuses exclusively on the qualitative prong, and that common proof will establish whether every member of the proposed class engaged in qualitatively administrative work for the entire class period. The trial court rejected this assertion, finding the common proof Plaintiffs proposed to present was legally insufficient to establish misclassification under the qualitative prong and that the nature of the work actually performed by Farmers's claims adjusters varied widely from adjuster to adjuster such that individual issues would predominate. The law and record support the trial court's ruling. We affirm.

---

[1] Title 8 of the California Code of Regulations, section 11040 is hereafter referred to as Wage Order 4-2001. (See *Harris v. Superior Court* (2011) 53 Cal.4th 170, 176-177 (*Harris I*).)

2

## FACTS AND PROCEDURAL BACKGROUND

1.      *The Parties and Complaint*

Farmers is a reciprocal or interinsurance exchange. It performs all the functions of a typical insurance company, including selling policies, contracting with agents who sell and service policies, procuring reinsurance, and adjusting claims made on its policies. Farmers employs "claims representatives" to adjust claims made on the policies it sells. We refer to these employees as claims adjusters.

Plaintiffs were employed as claims adjusters in Farmers's commercial liability group. Their operative second amended complaint alleges Farmers improperly classified claims adjusters on its commercial liability lines as "exempt" employees. As a result of the alleged misclassification, the complaint asserts Farmers unlawfully required claims adjusters to work uncompensated overtime and without off-duty meal and rest periods, while failing to provide accurate wage statements in violation of the Labor Code and Business and Professions Code.[2]

2.      *Plaintiffs Move for Class Certification*

Plaintiffs moved to certify seven subclasses, each " 'comprised of all persons who, since May 18, 2003, have been employed, or are currently employed, by [Farmers] in California as a Claims Representative in' one of seven different departments within Farmers 'and who were paid as exempt employees . . . , as the same are defined pursuant to statute and/or California or federal regulatory determination . . . .' " (Footnote omitted.) Plaintiffs defined the proposed subclasses to correspond to the following seven departments, each of which employed claims adjusters to service claims on Farmers's

---

[2]     The complaint asserts nine causes of action for (1) failure to pay overtime compensation in violation of Labor Code section 1194; (2) failure to provide meal periods in violation of Labor Code section 226.7; (3) failure to provide rest periods in violation of Labor Code section 226.7; (4) failure to provide accurate wage statements in violation of Labor Code section 226; (5) failure to pay compensation upon termination/resignation in violation of Labor Code sections 201 through 203; (6) declaratory relief; (7) accounting; (8) injunctive relief; and (9) unfair business practices in violation of Business and Professions Code section 17200 et seq.

various commercial policy lines: (1) Commercial Liability; (2) Commercial Property; (3) Construction Defect; (4) Mold; (5) Workers' Compensation; (6) National Large Loss; and (7) Environmental.

With respect to the requisite community of interest, Plaintiffs argued the claims adjusters "within each sub-class engage in the same core, finite duties" and that "nearly every aspect of [these duties] requires higher-level approval, involves an automated function, or is a routine, non-exempt job duty." For proof, Plaintiffs relied principally upon declarations from 16 putative class members, who stated they spent "the majority of their time performing routine, non-exempt duties," and deposition excerpts from several Farmers supervisors, who testified broadly about the "core duties" that claims adjuster within each department perform. Plaintiffs also offered evidence of "uniform policies," "guidelines" and "checklists," which Farmers purportedly "used to control nearly every aspect of the [claims adjusters'] daily duties." Based on this evidence, Plaintiffs maintained common questions predominated with respect to the administrative exemption's applicability to Farmers's claims adjusters, in particular whether adjusters spent "over fifty percent of their time on exempt tasks," and whether adjusters regularly exercised "independent judgment related to matters of significance."

3. *The Court of Appeal Issues the* Harris II *Opinion and Farmers Files Opposition to Class Certification*

Four days before Farmers filed its opposition to Plaintiffs' class certification motion, a divided Court of Appeal issued a published opinion in *Harris v. Superior Court* (July 23, 2012, B1915121) (*Harris II*), review denied and opinion ordered not published October 24, 2012, S205297.[3] In that opinion, the majority held the administrative

---

[3] The Court of Appeal decided *Harris II* after the Supreme Court reversed the appellate court's earlier judgment and remanded the case with directions to review the trial court's denial of summary judgment applying the legal standard articulated in *Harris I*. (*Harris I, supra,* 53 Cal.4th at p. 191.) In its original judgment, the appellate court erroneously applied the "administrative/production worker dichotomy" as a "dispositive test" to conclude that work performed by claims adjusters did not come within the administrative exemption articulated in Wage Order 4-2001. (*Harris I,* at

4

exemption did not apply to claims adjusters because their work was not *qualitatively* administrative under the majority's interpretation of Wage Order 4-2001 and the incorporated federal regulation.[4]

Farmers briefly addressed *Harris II* in its opposition, arguing the opinion was contrary to the Supreme Court's directives in *Harris I* (see fn. 3, *ante*) and the weight of other appellate authorities addressing the issue. The bulk of Farmers's opposition, however, focused on establishing the existence of individualized factual issues concerning the "primarily engaged in" and "independent judgment" elements of the administrative exemption, which had been the major focus of Plaintiffs' initial motion.

---

p. 190.) "In basic terms, the administrative/production worker dichotomy distinguishes between administrative employees who are primarily engaged in ' "administering the business affairs of the enterprise" ' and production-level employees whose ' "primary duty is producing the commodity or commodities, whether goods or services, that the enterprise exists to produce and market." [Citation.]' " (*Id.* at p. 183.) As applied by earlier cases decided under former Wage Order 4-1998, work that fell on the "production side" of the dichotomy did not qualify as administrative for purposes of the exemption. (*Id.* at p. 186.) In *Harris I*, the Supreme Court held the appellate court's rigid reliance on the dichotomy failed to account for significant additions to Wage Order 4-2001—in particular, the incorporation of regulations listed in the federal Fair Labor Standards Act of 1938 (29 U.S.C. § 201 et seq.) that provided a detailed definition of the phrase " 'directly related to management policies or general business operations.' " (*Harris I,* at pp. 179-180, italics omitted.) In remanding the matter to the appellate court, the Supreme Court instructed that, to resolve "whether work qualifies as administrative, courts must consider the particular facts before them and *apply the language of the statutes and wage orders at issue*" before invoking a judicially created test to determine whether work is qualitatively administrative. (*Id.* at p. 190, italics added.)

[4]    As we discuss in detail below, *Harris I* determined the "directly related" requirement has a "qualitative" and "quantitative" component under the wage order and incorporated federal regulation. (*Harris I, supra,* 53 Cal.4th at p. 181.) *Harris I* and *Harris II* focused on the qualitative component, which concerns the "types of duties that constitute 'administrative operations of the business.' " (*Harris I,* at p. 188.) Under the applicable federal regulation, "[t]he administrative operations of the business include the work performed by so-called white-collar employees engaged in 'servicing' a business as, for example, advising the management, planning, negotiating, representing the company, purchasing, promoting sales, and business research and control." (29 C.F.R. former § 541.205(b) (2000).)

Based on declarations by 14 putative class members, deposition testimony from several other class members, and documentary evidence, Farmers sought to demonstrate that claims adjusters' actual duties varied substantially both across and within the various departments. Farmers's evidence showed that an individual claims adjuster's duties, and the manner in which the adjuster performed his or her duties, depended on several factors unique to the particular adjuster, including the claims department in which the adjuster worked, the type of investigation required for a particular claim, the level of supervision over the adjuster, and whether the adjuster performed management duties, such as managing litigation or supervising others within the department.

With respect to whether claims adjusters exercised independent judgment, Farmers's evidence showed that the " 'uniform' " guidelines referenced in Plaintiffs' motion were only in place for certain departments during parts of the class period. Additionally, many of Farmers's declarants testified, contrary to Plaintiffs' assertions, that they looked to the guidelines only as a "tool" for determining "when things should be escalated" to a supervisor, but not as a "step-by-step" guide to adjusting a claim. As for supervisory control, Farmers's evidence showed this also varied among individual adjusters depending upon an adjuster's experience or past performance, or upon a supervisor's individual management style.

4.      *Plaintiffs File Their Reply and the Trial Court Issues Its Initial Order Granting Class Certification*

Following *Harris II*, Plaintiffs recast their theory of recovery to focus exclusively on the qualitative component of the directly related requirement. (See fn. 4, *ante.*) In their reply brief, Plaintiffs argued *Harris II* mandated certification insofar as the appellate opinion supplied a legal basis for finding, regardless of variations in the work performed by individual claims adjusters, that all putative class members had been misclassified as administratively exempt employees.

The trial court agreed that *Harris II* controlled. In its order initially granting certification, the court explained: "The issue is whether insurance adjusters are exempt. [*Harris II*] said no: not exempt. The wage and hour laws apply to them: meal breaks,

6

rest breaks, and all the rest.  Farmers dismisses this 'erroneous  analysis' [citation], but this appellate law compels certification.  [¶]  [*Harris II*] held that the alleged heterogeneity of the class was no reason to deny class certification.  [Citation.]  Farmers offers no evidentiary citations to distinguish that holding, which governs."

     5.     *The Supreme Court Depublishes* Harris II, *the Trial Court Denies Farmers's Motion for Reconsideration, and Farmers Obtains a Peremptory Writ of Mandate*

Three weeks later, the Supreme Court depublished *Harris II*, and Farmers promptly moved for reconsideration of the certification order.  (See *Harris II, supra,* review den. and opn. ordered nonpub. Oct. 24, 2012, S205297.)  Plaintiffs opposed, arguing depublication was not a change in law sufficient to authorize reconsideration.  The trial court agreed, and denied Farmers's motion.

Farmers petitioned this court for a peremptory writ, arguing the trial court erred in concluding it lacked authority to reconsider the certification order.  We granted the writ, concluding "[w]hen a court decision is made on the basis of an opinion that is subsequently depublished, the law justifying that decision has necessarily changed," thereby authorizing the court to reconsider a prior order on its own motion.  (*Farmers Ins. Exchange v. Superior Court* (2013) 218 Cal.App.4th 96, 109 (*Farmers*); see also Code Civ. Proc., § 1008, subd. (c).)  The writ directed the trial court to reconsider the class certification motion "in the absence of the [*Harris II*] opinion."  (*Farmers,* at p. 112.)

     6.     *The Parties File Supplemental Briefing on Reconsideration*

After remand, the trial court ordered supplemental briefing.  It directed the parties to utilize the existing evidentiary record and not to rely on *Harris II*.

Plaintiffs focused again on the directly related test's qualitative prong, this time emphasizing Farmers's responses to interrogatories as a source of common proof.  Their stated "theory of recovery," according to Plaintiffs' opening brief, was that Farmers could "never prove that its claims adjusters performed 'qualitatively' administrative job duties." Plaintiffs argued this theory was amenable to common proof—namely, the following

7

portion of Farmers's answers to interrogatories asking Farmers to "[l]ist all job duties performed by current and former [department] claims adjusters during the CLASS PERIOD":

> "[I]nterviewing insureds and witnesses; reviewing and analyzing factual information to prepare damages estimates; evaluating, determining and making recommendations regarding coverage; determining causation of, responsibility for and/or the total value of a claim; negotiating settlements; and making recommendations regarding litigation on litigated claims. They determine whether the policy covers the claimed loss, estimate Farmers' potential exposure on the claim; set a reserve for the claimed loss in accordance with applicable requirements; assess the credibility of insureds and witnesses; determine whether any fraud indicators are present with respect to a claim and advise Farmers' Special Investigation Unit regarding possible indicators; identify, evaluate and analyze the potential for subrogation; identify, analyze and evaluate any underwriting risk associated with the policy; reevaluate estimated loss exposure and reserve amounts as new information is obtained; communicate with opposing counsel and Farmers' counsel on litigated claims; and prepare cases for arbitration and attend settlement conferences and trials."[5]

---

[5] Though Farmers's separate response for each department contained the same list of duties, the responses also included the qualification that individual adjusters' specific duties, responsibilities and settlement authority varied, even within the same department, depending on the nature of the claim. Different claims, the responses explained, "require different expertise, the performance of different tasks and the evaluation of issues that are relevant to the different types of claims." The responses also highlighted differences in adjusters' experience levels and how different levels of experience affected an individual adjuster's settlement authority. For instance, the responses explained: "Most of these claims representatives may have many years of experience as a claims representative and have settlement authority levels ranging from $20,000 to over $500,000. Combined with other authority levels, some claims representatives handling commercial property losses can have cumulative authority levels up to a million dollars."

8

Plaintiffs argued this language constituted an admission by Farmers that all adjusters "did the same job duties regardless of the types of claims they were adjusting." And, while Plaintiffs conceded that some of the tasks listed in Farmers's responses were among those identified as qualitatively administrative by the applicable federal regulation (see fn. 4, *ante*), Plaintiffs maintained there would be "no need to inquire into each Class member's performance of their job duties" to assess the qualitative prong. Rather, Plaintiffs argued liability under the qualitative prong could be determined by assessing the nature of Farmers's business and "draw[ing] a single line" dividing those administrative duties that involved " 'servicing' [the] business" from those that did not. With this line drawn, Plaintiffs argued the trier of fact could decide Farmers's liability by simply determining whether the duties listed in its interrogatory responses fell "above or below" the line. "Where that line is drawn," Plaintiffs asserted, "is a clear merits question." For purposes of assessing class certification, Plaintiffs argued the only relevant inquiry was whether this "line" could be drawn for the entire class based on common proof.

Farmers insisted Plaintiffs' "line drawing" approach was contrary to *Harris I*, which had rejected the use of a judicially created dichotomy to displace the explicit and extensive framework set forth in Work Order 4-2001 and the incorporated federal regulations. (See fn. 3, *ante*.) Contrary to Plaintiffs' assertion that an abstract list of job duties would suffice to assess the qualitative prong for every adjuster in each department, Farmers argued the appropriate standard under *Harris I* required the fact finder to evaluate the work actually performed by each adjuster to determine whether the adjuster's work was qualitatively and quantitatively administrative. As an evidentiary matter, Farmers also disputed the contention that its adjusters' job duties were uniform. Pointing to the evidence submitted with its initial opposition, Farmers emphasized differences in the types of claims adjusted, the work necessary to investigate and adjust each claim, each adjuster's settlement authority, and each adjuster's reliance on guidelines. Farmers also stressed that, while the named Plaintiffs disclaimed any autonomy in their work, several other adjusters attested to making complex coverage

9

determinations, while participating in litigation strategy and mediation, and actively pursuing subrogation. Farmers argued these differences were relevant to determining whether an individual adjuster engaged in administrative tasks that serviced and had a substantial effect on the company, particularly in view of several federal court decisions that had concluded claims adjusters' duties were directly related to management policies and general business operations.

### 7. *The Court Denies Class Certification*

The trial court denied certification, concluding Plaintiffs "fail[ed] to submit substantial evidence [demonstrating] that the exemption questions at issue [could] be answered as to all putative class members using collective proof." In its written order, the court acknowledged Plaintiffs' "theory that the duties performed by adjusters do not satisfy the 'qualitative' element of the administrative exemption." With regard to the predominance requirement, the court reasoned that this theory could be certified for class recovery only if Plaintiffs could "establish through common, class-wide proof that all class members perform a finite set of specific duties and, based solely on the performance of those duties, [that] the Court could determine the exempt status of the entire class."

Addressing Plaintiffs' assertion that Farmers's interrogatory responses supplied the common proof necessary to establish that the putative class did not perform qualitatively administrative work, the court stated: "Even if Plaintiffs could establish that all class members perform the same general duties that Plaintiffs have described in their motion, it does not follow that this would require a finding of liability. While Plaintiffs attempt to create a shortcut to liability based on a purported uniform legal issue—that adjusters do not perform duties that can meet the qualitative prong of the exception—no court, including the California Supreme Court in [*Harris I*], has determined that the duties fail to satisfy the administrative exemption as a matter of law."

Apart from Farmers's interrogatory responses, the court found the evidence, "including deposition testimony from the named Plaintiffs and other adjusters, demonstrate[d] that the work adjusters perform varies greatly and that there are significant variations in how individual adjusters carry out their job duties." These

10

variations, the court observed, included differences concerning "the types of claims being adjusted, the tasks and skills required to handle the various claim types, whether or not the adjusters perform management duties, whether or not they are tasked with special assignments, and whether or not they retain experts and the extent to which they supervise and direct complex litigation." Further, the court found that "the impact of the adjusters' duties and decisions on [Farmers] and its customers varies," noting that "[t]he testimony in this case illustrates that there are significant differences between adjusters in their perceived autonomy, discretion to settle matters, use of manuals and handbooks, and use of estimating software." In view of these variations, the court concluded an individualized inquiry would be required to determine whether each putative class member performed " 'quantitatively' exempt work" and satisfied "the other elements of the administrative exemption."[6]

## DISCUSSION

1. *Class Certification Principles*

"Code of Civil Procedure section 382 authorizes class actions 'when the question is one of a common or general interest, of many persons, or when the parties are numerous, and it is impracticable to bring them all before the court . . . .' The party seeking certification has the burden to establish the existence of both an ascertainable class and a well-defined community of interest among class members." (*Sav-On Drug Stores, Inc. v. Superior Court* (2004) 34 Cal.4th 319, 326.) As " 'trial courts are ideally

---

[6] The court also found that Plaintiffs failed to offer a viable trial plan for managing these individualized issues. Because we conclude the court's ruling with respect to predominance is sufficient to affirm the order, we need not consider the court's other grounds for denying certification. (See *Hataishi v. First American Home Buyers Protection Corp.* (2014) 223 Cal.App.4th 1454, 1469.) Likewise, because each of Plaintiffs' separate causes of action is premised on the claim that Farmers misclassified the putative class under the administrative exemption, we address only this issue and do not consider the trial court's other specific grounds for denying certification as to particular causes of action. (See Lab. Code, § 515, subd. (a) [exempting "administrative" employees from overtime compensation; Lab. Code, § 226.7, subd. (e) [providing exemption from meal and rest periods].)

11

situated to evaluate the efficiencies and practicalities of permitting group action, they are afforded great discretion in granting or denying certification.' " (*Ibid.*)  Thus, "in the absence of other error, a trial court ruling supported by substantial evidence generally will not be disturbed 'unless (1) improper criteria were used [citation]; or (2) erroneous legal assumptions were made [citation]' [citation]." (*Linder v. Thrifty Oil Co.* (2000) 23 Cal.4th 429, 435-436.)

In this case, the trial court determined Plaintiffs' proposed class and subclasses lacked the requisite community of interest because Plaintiffs failed to establish predominant common questions.  "The 'ultimate question' the element of predominance presents is whether 'the issues which may be jointly tried, when compared with those requiring separate adjudication, are so numerous or substantial that the maintenance of a class action would be advantageous to the judicial process and to the litigants.' [Citations.]  The answer hinges on 'whether the theory of recovery advanced by the proponents of certification is, as an analytical matter, likely to prove amenable to class treatment.' " (*Brinker Restaurant Corp. v. Superior Court* (2012) 53 Cal.4th 1004, 1021 (*Brinker*).)  Thus, "[p]resented with a class certification motion, a trial court must examine the plaintiff's theory of recovery, assess the nature of the legal and factual disputes likely to be presented, and decide whether individual or common issues predominate." (*Id.* at p. 1025.)  "The affirmative defenses of the defendant must also be considered, because a defendant may defeat class certification by showing that an affirmative defense would raise issues specific to each potential class member and that the issues presented by that defense predominate over common issues." (*Walsh v. IKON Office Solutions, Inc.* (2007) 148 Cal.App.4th 1440, 1450; *Gerhard v. Stephens* (1968) 68 Cal.2d 864, 913.)

Though the trial court's ultimate ruling is reviewed for abuse of discretion (*Brinker, supra,* 53 Cal.4th at p. 1017), "[p]redominance is a factual question; accordingly, the trial court's finding that common issues predominate generally is reviewed for substantial evidence." (*Id.* at p. 1022.) Under both standards, "[w]e must '[p]resum[e] in favor of the certification order . . . the existence of every fact the trial court could reasonably deduce from the record . . . .' " (*Ibid.*)

Lastly, a class certification motion is procedural—it is "not a license for a free-floating inquiry into the validity of the complaint's allegations." (*Brinker, supra,* 53 Cal.4th at p. 1023.) "[R]ather, resolution of disputes over the merits of a case generally must be postponed until after class certification has been decided [citation], with the court assuming for purposes of the certification motion that any claims have merit [citation]." (*Ibid.*) However, " 'issues affecting the merits of a case may be enmeshed with class action requirements.' " (*Ibid.*) "In particular, whether common or individual questions predominate will often depend upon resolution of issues closely tied to the merits. . . . [W]hether an element may be established collectively or only individually, plaintiff by plaintiff, can turn on the precise nature of the element and require resolution of disputed legal or factual issues affecting the merits." (*Id.* at p. 1024.) In such cases, analysis of the propriety of class certification may entail some overlap with the merits of the underlying claims, and, in that event, evaluation of the merits of the plaintiffs' claims is proper. (*Ibid.*; *Cruz v. Sun World Internat., LLC* (2015) 243 Cal.App.4th 367, 377.)

2. *The Administrative Exemption and Directly Related Test*

To frame our discussion of the "legal and factual disputes" that impacted the trial court's predominance analysis (*Brinker, supra,* 53 Cal.4th at p. 1025), we begin with the law governing the administrative exemption, and, in particular, the exemption's "directly related" prong.

Labor Code section 515, subdivision (a), exempts certain "executive, administrative, and professional employees" from overtime compensation. (See also Lab. Code, § 226.7, subd. (e) [allowing exemption from meal and rest periods].) To

13

qualify as "administrative," employees must "(1) be paid at a certain level, (2) their work must be administrative, (3) their primary duties must involve that administrative work, and (4) they must discharge those primary duties by regularly exercising independent judgment and discretion." (*Harris I, supra,* 53 Cal.4th at p. 178; Lab. Code, § 515, subd. (a).)  Because the exemption operates as an affirmative defense against claims that an employer violated the Labor Code's general overtime pay and meal/rest period requirements, the employer bears the burden of establishing each prong of the exemption. (See *Ramirez v. Yosemite Water Co.* (1999) 20 Cal.4th 785, 794-795.)  Assessing an exemption defense in a "misclassification [case] will typically require an inquiry into a particular job type and into the work actually done by individuals within that job category." (*Mies v. Sephora U.S.A., Inc.* (2015) 234 Cal.App.4th 967, 979.)  In this case, Plaintiffs' theory of recovery focused on the second prong—whether the work performed by Farmers's claims adjusters is "administrative."

The statutory standards that govern the administrative exemption are to be "understood in light of the applicable wage order." (*Harris I, supra,* 53 Cal.4th at p. 178.)  Under Wage Order 4-2001, an employee comes within the second prong of the exemption if he or she performs "office or non-manual work *directly related to management policies or general business operations* of his/her employer or his employer's customers." (Wage Order 4-2001, subd. (1)(A)(2)(a)(I), italics added.)  The wage order does not define the italicized phrase; rather, it defers to federal regulation, directing that "[t]he activities constituting exempt work and non-exempt work shall be construed in the same manner as such terms are construed in the following regulations under the Fair Labor Standards Act effective as of the date of this order:  29 C.F.R. Sections 541.201–205, 541.207–208, 541.210, and 541.215."[7]  (Wage Order 4-2001, subd. (1)(A)(2)(f); *Harris I,* at pp. 179-180.)  "So, just as the statute is understood in light

---

[7]     Regulations appearing in title 29 of the Code of Federal Regulations are hereafter referred to as "Federal Regulations."  Citations to the Federal Regulations are as they existed on January 1, 2001, the effective date of Wage Order 4-2001.

of the wage order, the wage order is construed in light of the incorporated federal regulations."  (*Harris I*, at p. 179.)

Federal Regulations former part 541.205(a) (2000), explains the "directly related" phrase.  It states:  "The phrase 'directly related to management policies or general business operations of his employer or his employer's customers' describes those types of activities relating to the administrative operations of a business as distinguished from 'production' or, in a retail or service establishment, 'sales' work.  In addition to describing the types of activities, the phrase limits the exemption to persons who perform work of substantial importance to the management or operation of the business of his employer or his employer's customers."  (Fed. Regs. § 541.205(a) (2000).)

As our Supreme Court explained in *Harris I*, "[p]arsing the language of the regulation reveals" the "directly related" phrase has "two components" that must be met for work to qualify as administrative.  (*Harris I, supra,* 53 Cal.4th at p. 181.)  First, the work must be "*qualitatively* administrative"—that is, it must be among " 'those types of activities relating to the administrative operations of a business.' "  (*Id.* at pp. 180-181 & fn. 6.)  Second, "*quantitatively,*" the work "must be of substantial importance to the management or operations of the business."  (*Id.* at p. 181.)  Both the qualitative *and* quantitative components must be satisfied for work to be considered "directly related" to management policies or general business operations.  (*Harris I,* at pp. 181-182.)

Federal Regulations former part 541.205(b) (2000) expounds on the "types of duties that constitute 'administrative operations of the business' "—i.e., the qualitative component.  (See *Harris I, supra,* 53 Cal.4th at pp. 182, 188.)  The regulation states, in relevant part:  "The administrative operations of the business include the work performed by so-called white-collar employees engaged in 'servicing' a business as, for example, advising the management, planning, negotiating, representing the company, purchasing, promoting sales, and business research and control."  (Fed. Regs. § 541.205(b) (2000).)

Federal Regulations former part 541.205(c) (2000) elaborates on the phrase "of substantial importance to the management or operation of the business"—i.e., the quantitative component.  (*Harris I, supra,* 53 Cal.4th at pp. 181-182.)  It provides:  "As

15

used to describe work of substantial importance to the management or operation of the business, the phrase 'directly related to management policies or general business operations' is not limited to persons who participate in the formulation of management policies or in the operation of the business as a whole. Employees whose work is 'directly related' to management policies or to general business operations include those [whose] work affects policy or whose responsibility it is to execute or carry it out. The phrase also includes a wide variety of persons who either carry out major assignments in conducting the operations of the business, or whose work affects business operations to a substantial degree, even though their assignments are tasks related to the operation of a particular segment of the business." (Fed. Regs. § 541.205(c) (2000).)

Finally, a series of subparts to Federal Regulations former part 541.205(c) (2000) expand on the relationship between the qualitative and quantitative components of the directly related test. Several subparts discuss tasks that presumptively meet the test's qualitative component in order to illustrate factors that should be considered in determining whether those tasks also meet the quantitative prong. (See, e.g., Fed. Regs. § 541.205(c)(1)-(c)(5) (2000).) Of particular relevance, former part 541.205(c)(5) (2000) addresses "claim agents and adjusters" specifically. It states: "The test of 'directly related to management policies or general business operations' is also met by many persons employed as advisory specialists and consultants of various kinds, credit managers, safety directors, *claim agents and adjusters*, wage-rate analysts, tax experts, account executives of advertising agencies, customers' brokers in stock exchange firms, promotion men, and many others." (Fed. Regs. § 541.205(c)(5) (2000), italics added.) Notably, by stating such "advisory specialists" meet "the test of '*directly related to management policies or general business operations*,' " the regulation provides guidance on *both* the qualitative and quantitative components of the test. (*Ibid.*, italics added; see *Harris I, supra,* 53 Cal.4th at pp. 181-182.)

16

In *Harris I*, our Supreme Court emphasized the primacy of the statutory language, while cautioning against the use of a "judicially created" test—the administrative/production worker dichotomy (see fn. 3, *ante*)—to determine whether work is directly related to management policies or general business operations. (*Harris I, supra,* 53 Cal.4th at p. 188.) "Read together," the high court explained, "the applicable Labor Code statutes, wage orders, and incorporated federal regulations now provide an explicit and extensive framework for analyzing the administrative exemption." (*Id.* at p. 82.) Given this framework, *Harris I* directs that "in resolving whether work qualifies as administrative, courts must consider the particular facts before them and apply the language of the statutes and wage orders at issue." (*Id.* at p. 190.) In doing so, "Federal Regulations former part 541.205(a), (b), and (c) (2000) must be read *together* in order to apply the 'directly related' test and properly determine whether the work at issue satisfies the administrative exemption." (*Id.* at p. 188, italics added.) "Only if those sources fail to provide adequate guidance," the court concluded, "is it appropriate to reach out to other sources" to determine whether work meets the directly related test. (*Id.* at p. 190; see also *id.* at p. 188 [faulting lower appellate court majority for applying a test that was "a judicially created creature of the common law, which [had] been effectively superseded in this context by the more specific and detailed statutory and regulatory enactments"]; and see fn. 3, *ante*.)

With these principles in mind, we turn to Plaintiffs' theory of recovery and the trial court's finding that Plaintiffs failed to establish predominate common issues.

3.      *The Court Did Not Abuse Its Discretion; Substantial Evidence Supports the Court's Finding That Individualized Issues Will Predominate in a Class Adjudication of the Directly Related Requirement*

To reiterate, the requirement that common issues predominate "hinges on 'whether the theory of recovery advanced by the proponents of certification is, as an analytical matter, likely to prove amenable to class treatment.' " (*Brinker, supra,* 53 Cal.4th at p. 1021.) Consistent with this principle, we begin by revisiting Plaintiffs' stated theory of recovery.

17

In their supplemental briefs following remand, Plaintiffs asserted the putative class was entitled to recovery on their misclassification claims because Farmers could "never prove that its claims adjusters performed 'qualitatively' administrative job duties." To demonstrate this theory was amenable to class treatment, Plaintiffs argued that a paragraph excerpted from Farmers' interrogatory responses constituted an admission that "the claims adjusters in this case perform the same job duties regardless of the type of claims they are adjusting." Critically, Plaintiffs acknowledged that several of the duties listed in those responses matched language in Federal Regulations former part 541.205(b) (2000), which describes tasks that "relat[e] to the administrative operations of a business." These included, among other things, "making recommendations regarding coverage"; "negotiating settlements"; "making recommendations regarding litigation"; "determin[ing] whether any fraud indicators are present with respect to a claim and advis[ing] [Farmers's] Special Investigation Unit regarding possible indicators"; "identify[ing], evaluat[ing] and analyz[ing] the potential for subrogation"; and "identify[ing], analyz[ing] and evaluat[ing] any underwriting risk associated with the policy." (Cf. Fed. Regs. § 541.205(b) (2000).) Notwithstanding this concession, Plaintiffs maintained the interrogatory responses were legally sufficient to support their theory of recovery because, they argued, "while *some* advising, planning, negotiating and representing duties may qualify as qualitatively administrative others do not." Focusing on the phrase " 'servicing' a business" in former part 541.205(b) (2000), Plaintiffs asserted the trier of fact could decide Farmers's liability to the class by assessing the nature of Farmers's business and drawing a "line" to determine whether the tasks listed in Farmers's interrogatory answers involved servicing its business or not. Plaintiffs maintained this "merits" question could be answered without "inquir[ing] into each Class member's performance of their job duties."

The trial court rejected Plaintiffs' contention that the exemption issue could be resolved by reference to Farmers's interrogatory answers, concluding that individualized evidence of what each putative class member actually did would be necessary to determine whether his or her work satisfied the directly related requirement. With regard

18

to Plaintiffs' contention that Farmers's interrogatory responses were sufficient to defeat the exemption defense for the entire class, the court ruled that Plaintiffs' line drawing approach was not legally tenable because the "[f]ederal regulations . . . specifically identify the 'core duties' identified by Plaintiffs . . . as administratively exempt work" and "no court, including the California Supreme Court in [*Harris I*], has determined that the duties fail to satisfy the administrative exemption as a matter of law."[8] Having determined Plaintiffs failed to satisfy their burden with respect to the qualitative prong, the court also addressed the quantitative component, and found individual inquiries were necessary to determine whether each putative class member performed quantitatively exempt work. And, because Plaintiffs failed to show they could establish liability through "common proof that all adjusters perform the same duties, and more importantly perform them in the same manner," the court concluded "certification [was] inappropriate."

On appeal, Plaintiffs contend the trial court improperly ruled on the merits of their misclassification claims and erroneously concluded Farmers's interrogatory responses were insufficient to establish class liability on their theory of recovery. In that regard, Plaintiffs argue evidence concerning "differences among the day-to-day tasks performed

---

[8] We disagree with Plaintiffs' contention that the court improperly reached the merits by assessing whether the tasks listed in Farmers's interrogatory responses were qualitatively administrative. Just as a *legally compliant* off-the-clock policy cannot be used to show a rest period claim is amenable to common proof, so too Farmers' interrogatory responses—insofar as they listed tasks that are qualitatively administrative—could not be used to show Plaintiffs' misclassification claim should be certified for class treatment. In the rest period case, liability can be established only by showing a *deviation from the policy*, thus raising individualized issues. (See, e.g., *Brinker*, *supra,* 53 Cal.4th at p. 1051 [where defendant's formal off-the-clock policy was consistent with state law, and anecdotal evidence showed only a handful of individual instances in which employees worked off-the-clock, certification of rest period claim was properly denied].) So too, here, insofar as the tasks listed in Farmers's responses were, by definition, qualitatively administrative, individual claims adjusters can establish misclassification under the qualitative prong only be showing that they *did not* engage in these tasks. It was therefore incumbent upon the trial court to reach this issue in connection with ruling on Plaintiffs' certification motion.

19

by class members" was irrelevant, because, they contend, the "qualitative inquiry" is limited to assessing the "*functional role*" that employees "play within the structure of [a] business." (Italics added.) Plaintiffs base their functional role test on language in Federal Regulations former part 541.205(b) (2000) explaining the "administrative operations of the business" include "the work performed by so-called white-collar employees engaged in '*servicing' a business*." (Italics added.) Plaintiffs argue the exemption defense can be resolved on a class-wide basis by deciding, as a factual matter, whether the duties listed in Farmers's interrogatory responses "related to the 'core day-to-day business' of the company or whether [the claims adjusters] 'participate[d] in policy-making or alter[ing] the general operation of the business' "—the latter being qualitatively administrative, the former, not. To resolve this question, Plaintiffs assert "the trier of fact will simply be required to analyze [the adjusters' 'functional'] role, compare it with the roles played by others employed by [Farmers], and examine the nature of [Farmers's] overall business to determine whether class members are helping the organization run or are carrying out its day-to-day affairs."

Because Plaintiffs' "functional role" test served as the lynchpin for their assertion that the exemption defense could be adjudicated for the entire putative class upon common proof (*i.e.*, Farmers's interrogatory responses), the legal merits of that test were inextricably enmeshed with the predominance inquiry, and we find no error in the trial court considering the merits on that narrow issue. (See *Brinker, supra,* 53 Cal.4th at pp. 1023-1024.) Thus, with regard to predominance, while the court was obliged to assume that Plaintiffs' misclassification claims had merit, the court correctly discerned that the critical *certification question* was whether Farmers's exemption defense could be resolved in favor of all putative class members by proving that claims adjusters performed the same "core duties" listed in Farmers's interrogatory responses. And, because several of the duties listed in those responses were, as Plaintiffs conceded, among the qualitatively administrative tasks enumerated in Federal Regulations former part 541.205(b) (2000), the court also properly recognized that answering the certification question required it to consider the legal merits of Plaintiffs' contention that "***some***

20

advising, planning, negotiating and representing duties" do not qualify as qualitatively administrative if an employee's "functional role" merely involves "carrying out [the business's] day-to-day affairs." In resolving the certification question, the trial court concluded the words of the statute controlled and that Plaintiffs' "functional role" test was contrary to the Supreme Court's holdings in *Harris I*. We agree with this conclusion.

The Supreme Court's directive in *Harris I* is clear—"in resolving whether work qualifies as administrative, courts must consider the particular facts before them and *apply the language of the statutes and wage orders* at issue. *Only if* those sources fail to provide *adequate guidance* . . . is it appropriate to reach out to other sources." (*Harris I, supra,* 53 Cal.4th at p. 190, italics added.) Contrary to this directive, Plaintiffs' proposed functional role test amounts to an illegitimate gloss on the meaning of the phrase "engaged in 'servicing' a business." (Fed. Regs. § 541.205(b) (2000).) This is because Federal Regulations former part 541.205(b) (2000) provides entirely *adequate guidance* as to what that phrase means in this context. According to former part 541.205(b) (2000), "engaged in servicing a business" means "advising management, planning, negotiating, [and] representing the company." (See also *Harris I,* at p. 182.) By arguing the statute's plain language means what it says only if an employee's "functional role" involves " 'policy-making or alter[ing] the general operation of the business,' " Plaintiffs effectively seek to import a qualification into the qualitative prong that has no basis in the text of former part 541.205(b) (2000). This again is contrary to the Supreme Court's clear directive in *Harris I*, and the trial court properly rejected it as such.[9] Further,

---

[9] The authorities Plaintiffs cite to support their "functional role" test are essentially inapposite in light of *Harris I*. These cases were largely decided before *Harris I* and fail to distinguish between the directly related test's qualitative and quantitative components. In discussing whether an employee's "function" or "role" brings the employee within the administrative exemption, nearly all of these cases apply the administrative/production worker dichotomy rejected in *Harris I*. (See, e.g., *Combs v. Skyriver Communications, Inc.* (2008) 159 Cal.App.4th 1242, 1264 [applying current version of Federal Regulations part 541.201, rather than qualitative/quantitative prongs defined in former part 541.205 (2000) as directed by *Harris I*]; *Desmond v. PNGI Charles Town Gaming, L.L.C.* (4th

because Plaintiffs' "functional role" test constituted the sole legal justification for their contention that Farmers's interrogatory responses were sufficient to defeat the exemption defense for the putative class, in rejecting that non-statutory test, the trial court correctly concluded that Plaintiffs failed to establish predominate common issues with respect to the qualitative prong.

To be clear, while "advising the management, planning, negotiating, [and] representing the company" are, by definition, *qualitatively* administrative tasks (Fed. Regs. § 541.205(b) (2000)), this does not necessarily mean that all such tasks are " '*directly related* to management policies or general business operations.' " (*Id.* § 541.205(a) (2000), italics added.) However, contrary to Plaintiffs' proposed functional role test, the dividing line cannot be derived from a non-statutory definition of the phrase " 'servicing' a business." Rather, the line must be drawn, as the statute directs, according to whether the employee's qualitatively administrative work is "of substantial importance to the management or operation of the business"—that is, whether the work meets the *quantitative* prong of the directly related test. (*Id.* § 541.205(c) (2000).) Reading the parts together, as *Harris I* directs that we must (see *Harris I, supra,* 53 Cal.4th at p. 188), the regulation expressly recognizes that not all tasks that involve "advising the management, planning, negotiating, [and] representing the company" are " 'directly related to management policies or general business operations,' " because not all such

Cir. 2009) 564 F.3d 688, 693 [same]; *Eicher v. Advanced Business Integrators, Inc.* (2007) 151 Cal.App.4th 1363, 1372 [applying administrative/production worker dichotomy as articulated in *Bell v. Farmers Ins. Exchange* (2001) 87 Cal.App.4th 805]; *Reiseck v. Universal Communs. of Miami, Inc.* (2d Cir. 2010) 591 F.3d 101, 107 [considering "administrative/sales distinction"]; *Davis v. J.P. Morgan Chase & Co.* (2d Cir. 2009) 587 F.3d 529, 535 [concluding "job of underwriter as it was performed at Chase falls under the category of production rather than of administrative work"]; *Copas v. E. Bay Mun. Util. Dist.* (N.D. Cal. 1999) 61 F.Supp.2d 1017, 1021-1022 [discussing distinction between "administrative positions" and employees engaged in " '[p]roduction' or 'line' work"]; cf. *Martin v. Ind. Mich. Power Co.* (2004) 381 F.3d 574, 582 [rejecting administrative/production worker dichotomy, holding plaintiff did not come within administrative exemption because his work "in no way involved" tasks listed in Federal Regulations former part 541.205(b) (2000)].)

tasks are "of substantial importance to the management and operation of the business."[10] (Fed. Regs. §§ 541.205(a), (b) & (c) (2000).)

The trial court's appreciation of this distinction is reflected in its conclusion that individualized inquiries were necessary to determine whether the work actually performed by a given adjuster satisfied the administrative exemption's directly related test. Having correctly determined that the tasks listed in Farmers's interrogatory responses were, by definition, qualitatively administrative under Federal Regulations former part 541.205(b) (2000), the court logically considered whether misclassification under the quantitative prong could be determined upon common proof for the entire class. In that regard, the court found that "the impact of the adjusters' duties and decisions on [Farmers] and its customers varie[d]," and that the evidence demonstrated "significant differences between adjusters in their perceived autonomy, discretion to settle matters, use of manuals and handbooks, and use of estimating software." As the trial court concluded, all of these differences will be relevant to determining whether an individual adjuster's qualitatively administrative work was "of substantial importance to the management or operation of the business." (Fed. Regs. § 541.205(c) (2000).) The court did not err in ruling individual inquiries were necessary to determine whether a particular claims adjuster's work satisfied the directly related prong of the administrative exemption.

---

[10] The only post-*Harris I* decision cited by Plaintiffs is *Rieve v. Coventry Health Care, Inc.* (C.D. Cal. 2012) 870 F.Supp.2d 856 (*Rieve*) and it is not persuasive. In *Rieve*, the federal district court, although purporting to examine the qualitative component expressly based its conclusion that "not all employees who interact with the public perform *administratively exempt* duties" on the *quantitative* prong. (*Id.* at p. 873, italics added [citing Federal Regulations former part 541.205(c)(1)—*i.e.*, the quantitative prong].) *Rieve* does not support Plaintiffs' contention that *some* advising, planning, and negotiating tasks are not *qualitatively* administrative. Rather, *Rieve* is consistent with our conclusion that not all *qualitatively* administrative tasks are *administratively exempt*, because not all such tasks satisfy the directly related test's *quantitative* prong.

23

## DISPOSITION

The order denying class certification is affirmed. Defendant Farmers Insurance Exchange is entitled to its costs on appeal.

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

HOGUE, J.[*]

We concur:

ALDRICH, Acting P. J.

LAVIN, J

---

[*] Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.