HONORABLE STEVE C. JONES, UNITED STATES DISTRICT JUDGE
This matter is before the Court for consideration of Plaintiff's Motion for Partial Summary Judgment and Defendant's Motion for Summary Judgment. In this Fair Labor Standards Act ("FLSA") case, Plaintiff has moved for summary judgment declaring Defendant cannot, as a matter of law, assert the affirmative defense that Plaintiff was exempt from FLSA provisions under the administrative employee exemption. See Doc. No. [60]. Defendant has moved for summary judgment on all of Plaintiff's claims, on the grounds that she is unable, as a matter of law, to demonstrate employer knowledge of her overtime hours or to establish with any reasonable certainty the amount of hours she worked. See Doc. No. [61].
*1166 I. LEGAL STANDARD
Federal Rule of Civil Procedure 56(a) provides "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A factual dispute is genuine if the evidence would allow a reasonable jury to find for the nonmoving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A fact is "material" if it is "a legal element of the claim under the applicable substantive law which might affect the outcome of the case." Allen v. Tyson Foods, Inc., 121 F.3d 642, 646 (11th Cir. 1997).
The moving party bears the initial burden of showing, by reference to materials in the record, that there is no genuine dispute as to any material fact that should be decided at trial. Hickson Corp. v. N. Crossarm Co., 357 F.3d 1256, 1260 (11th Cir. 2004) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) ). The moving party's burden can be discharged either by showing an absence of evidence to support an essential element of the nonmoving party's case or by showing the nonmoving party will be unable to prove their case at trial. Celotex, 477 U.S. at 325, 106 S.Ct. 2548 ; Fitzpatrick v. City of Atlanta, 2 F.3d 1112, 1115 (11th Cir. 1993). In determining whether the moving party has met this burden, the court must consider the facts in the light most favorable to the nonmoving party. See Robinson v. Arrugueta, 415 F.3d 1252, 1257 (11th Cir. 2005).
Once the moving party has adequately supported its motion, the non-movant then has the burden of showing that summary judgment is improper by coming forward with specific facts showing a genuine dispute. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). There is no "genuine [dispute] for trial" when the record as a whole could not lead a rational trier of fact to find for the nonmoving party. Id.; see also Nebula Glass Int'l, Inc. v. Reichhold, Inc., 454 F.3d 1203, 1210 (11th Cir. 2006) (the nonmoving party cannot survive summary judgment by pointing to "a mere scintilla of evidence"). All reasonable doubts, however, are resolved in the favor of the nonmoving party. Fitzpatrick, 2 F.3d at 1115. In addition, the court must "avoid weighing conflicting evidence or making credibility determinations." Stewart v. Booker T. Washington Ins., 232 F.3d 844, 848 (11th Cir. 2000).
II. BACKGROUND
In light of the foregoing standard, the Court makes the following findings of fact for the purpose of resolving the parties' motions for summary judgment. The Court derives the facts from the admitted portions of the parties' statements of material facts and the Court's own review of the record. See Doc. Nos. [60-2]; [61-1]; [84-2]; [84-3]; [85-1]; [85-2]; [100-2]; [101-1]. The Court resolved the parties' objections, where possible, as it reviewed the record.[1]
*1167 If a party admitted a fact in part, the Court includes the substance of the undisputed part. If a party denied a fact in whole or in part, the Court reviewed the record to determine if a dispute exists and if it is material. The Court excludes facts, or parts of facts, that are legal conclusions, immaterial, inadmissible at trial, or not supported by citation to record evidence.
Defendant Silverton Mortgage Specialists, Inc. ("Defendant" or "Silverton") is a licensed mortgage banker and lender headquartered in Atlanta, Georgia. Doc. No. [100-2], ¶1. Silverton originates, closes, and funds residential mortgage loans. Doc. No. [85-1], ¶1. It also sells loans on the secondary market and services some residential loans. Id. Silverton paid its underwriters overtime pay for hours reported over forty hours in a workweek. Id. at ¶2. In addition, Silverton paid underwriters bonuses based on their productivity and the accuracy of their work. See id. at ¶¶32, 33.
Plaintiff Elaine Watts ("Plaintiff") was employed by Silverton as a mortgage loan underwriter from December 27, 2016 to September 1, 2017. Id. at ¶3. From December 27 through roughly May 30, 2017, Plaintiff worked in Silverton's corporate office in Midtown, Atlanta. Doc. No. [100-2], ¶3. After May 30, 2017, Plaintiff worked remotely from her home in Morrow. Id. at ¶4. Plaintiff reported directly to David Freas, Silverton's then Underwriting Manager. Doc. Nos. [84-2], ¶ 3; [101-1], ¶4. Plaintiff was compensated $ 70,000 per year on a salary basis. Doc. No. [100-2], ¶5.
A. Plaintiff's Job Duties
The parties heavily dispute how to characterize Plaintiff's primary job duty. Both parties assert facts that contain argumentative phrasing and carefully cloaked legal conclusions. As the determination of Plaintiff's exempt status under the FLSA turns on mixed issues of law and fact regarding Plaintiff's primary duties, her duties' relation to the general business operations of Silverton, and the amount of discretion those duties involved, the Court omits the parties' argumentative language and legal conclusions.
What the parties do agree on is that Plaintiff was employed to review loan applications. See Doc. Nos. [85-1], ¶ 4; [100-2], ¶6. Plaintiff did not play any role in the creation, development, or sale of residential loan products, nor did she communicate with prospective borrowers or advise customers on loan products. Doc. No. [100-2], ¶11. Rather, Plaintiff and other underwriters were responsible for the loan quality, integrity, and risk related to a loan request. Id. at ¶16; see also Doc. No. [85-1], ¶6.
When determining whether a borrower qualified for a particular loan, Plaintiff would review the application in the context of various lender guidelines and criteria. Doc. No. [100-2], ¶17. Plaintiff considered information such as the borrower's income, *1168 assets, liabilities, and credit history, as well as the title, purchase contract, and appraisal associated with the property to be purchased. Id. at ¶7. Plaintiff analyzed the information provided in the loan application and conducted additional research if necessary. See id. at ¶10.
The guidelines and criteria utilized by Plaintiff included the Fannie Mae and Freddie Mac Guidelines, Silverton's Standard Operations Policy and Procedure Manual, and Silverton's Selling Guide (collectively, "the guidelines"). Id. at ¶18; see also Doc Nos. [86-1]; [86-3]; [120-6]. Plaintiff reviewed loans to ensure they fit the criteria set by the guidelines. Doc. No. [85-1], ¶9; see also Doc. No. [100-2], ¶17. Plaintiff first reviewed loan applications under the Fannie Mae and Freddie Mac guidelines. Doc. No. [85-1], ¶10. If the loan did not meet these guidelines, Plaintiff reviewed the loan under Silverton's Standard Operations Policy and Procedure Manual and Silverton's Selling Guide. Id. at ¶11.
The guidelines tell underwriters how to determine a customer's creditworthiness, including what factors to review, what documentation to review to determine those factors, and how long of an income/employment history to gather for the customer. Id. at ¶18; see also Doc. No. [120-6], pp. 346-612, 386. When reviewing employment history, underwriters learned from the guidelines what information to look for and when it was necessary to get a letter of explanation from the customer. Doc. No. [85-1], ¶22; see also Doc. No. [120-6], pp. 358-453. The guidelines provide detailed instructions regarding numerous factors, including how to assess a borrower's eligibility, how to assess a property's eligibility, how to assess income, assets, liabilities, and credit history, and how to select appraisers and evaluate appraisals. See Doc. No. [120-6].
Silverton's Policy and Procedure Manual and its Selling Guide are not limited to specifying when an underwriter can issue exceptions on a loan application, nor do they specify all cases when an underwriter can issue exceptions. Doc. No. [100-2], ¶19. Rather, Silverton's Policy and Procedure Manual and Selling Guide provide, among other things, additional considerations the underwriter should consider in evaluating loan applications over and above what may be contained in other lender guidelines. Id. at ¶20.
Although Plaintiff considered the guidelines when underwriting loan applications, the guidelines do not specify or dictate all courses of action an underwriter must undertake to evaluate a loan application. Id. at ¶21. Sometimes these guidelines are very specific as to what they require. Id. Other times, however, they are silent on issues. Id. For example, the Fannie Mae guidelines require that an underwriter review the appraisal of a subject property to ensure that the property provides adequate collateral for the requested loan. Id. at ¶22. In particular, the underwriter must review the appraisal to ensure that the appraiser has provided an accurate and reliable opinion of value that reflects the market value, condition, and marketability of the subject property in compliance with Fannie Mae's Selling Guide requirements. Id. at ¶23.
As another example, the underwriter might perform her own research to assess the soundness of the appraiser's reliance on certain comparable sales and request that the appraiser explain why he or she selected or excluded certain properties. Id. at ¶27. The Fannie Mae guidelines further require that the underwriter pay particular attention and institute extra due diligence for those loans in which the appraised value is believed to be excessive or when the value of the property has experienced *1169 significant appreciation in a short time period since the prior sale. Id. at ¶30. The Fannie Mae guidelines do not specify what constitutes an "excessive" appraised value or "significant appreciation" over a "short time period," nor do they detail the "extra due diligence" that must be conducted in evaluating such loan applications. Id. at ¶ 31. While the Silverton Policy and Procedure Manual references "excessive" collateral, it leaves it up to the underwriter to decide whether to require an additional appraisal or additional documentation to support the property's value. Id. at ¶32. If an underwriter determined that an appraisal was deficient, the Fannie Mae guidelines suggest possible approaches to addressing this, including discussing the deficiencies with the appraiser, obtaining a desk or field review of the appraisal, or obtaining a new appraisal. Id. at ¶33.
An underwriter could require borrowers to satisfy certain stipulations or conditions before the underwriter would approve the loan. Doc. Nos. [85-1], ¶¶ 19, 20; [100-2], ¶12. However, the parties dispute whether underwriters could grant exceptions and approve loans that did not meet the guidelines without manager approval. See Doc. Nos. [85-1], ¶¶ 12, 13; [100-2], ¶¶13, 14, 41, 42. The guidelines do not prescribe what stipulations the underwriter can demand and in what circumstances they can be demanded, or under what circumstances an underwriter can issue an exception or counter-offer. Doc. No. [100-2], ¶43. Thus, while an underwriter's review and evaluation of a loan application is influenced by various guidelines, the guidelines do not dictate all course of action the underwriter must take in reaching a decision on the loan application. Id. at ¶45.
B. Plaintiff's Work Hours
Defendant offers a multitude of facts regarding the hours of overtime that Plaintiff alleged in her complaint and discovery responses. See Doc. No. [84-2], ¶¶6-11. Defendant offers these facts in attempt to show that Plaintiff's claims have changed and, therefore, are not credible. See Doc. No. [61]. However, as credibility issues are for the jury, the Court finds these facts immaterial to determining whether there is evidence in the record to support Plaintiff's claims. Defendant also offers facts designed to show that particular statements in Plaintiff's deposition testimony are contradicted by other evidence in the record. Again, such contradictions are credibility issues for the jury. Ultimately, Plaintiff claims that she worked overtime hours for which she was not paid and her manager knew she worked such hours. Therefore, the Court only includes facts relevant to determining if there is a genuine dispute of fact (i.e. competing pieces of evidence in the record) regarding these claims.
On August 24, 2016, Silverton's Operations Manager, Jen Burns, sent an email to Plaintiff's manager, David Freas. See Doc. No. [81-6]. In it, she stated, "the amount of OT [overtime] being logged must decrease significantly, if not be eliminated." Id. at 2. She went on to suggest that he "implement no authorized OT/or all OT must be prior approved." Id. In the ensuing exchange, both Burns and Freas acknowledged it would be unlikely that they could eliminate all overtime. Id. at 1-2. Burns expressed concern about some underwriters "putting in crazy amounts of OT." Id. at 1.
On March 1, 2017, Freas held a morning "huddle" meeting with the underwriters to explain Silverton's new overtime policy. Doc. Nos. [84-2], ¶ 13; [101-1], ¶12. Plaintiff was in attendance at that meeting. Doc. No. [101-1], ¶12. Following the meeting, *1170 Freas sent an email to the underwriters (including Plaintiff) that outlined the discussion in the meeting. See Doc. No. [119-42]. The email states:
1) Max OT is 7 hours per week
2) To justify OT, the pipeline must exceed the minimum 2 new loans and 3/4 conditions without extenuating circumstances
3) Forward OT to me each Monday along with the email approval
4) If you need to roll a file to avoid OT, make sure you reach out to the LO and processor (remember-our goal is to be over 95% within turn times, not 100%)
Id. Freas testified that completing two new loans and three or four conditions was the normal production expectation. Doc. No. [105], pp. 9-10.
While employed by Silverton, Plaintiff prepared timesheets each week. Doc. No. [84-2], ¶18. Plaintiff's timesheets and payroll records show weeks in which Plaintiff reported, and was paid for, overtime. See Doc. Nos. [111-30]; [111-31]; [111-37] to [111-46]. One week, Plaintiff reported and was paid for more than seven hours of overtime. Doc. Nos. [111-40]; [111-31], p. 3. Plaintiff testified that her manager made an exception for her because she was taking vacation the following week. Doc. No. [101-1], ¶17; see also Doc. No. [111], pp. 201-02. Plaintiff also testified that there were times when she worked overtime that her manager did not deem "justified," and he instructed her to change her timesheet to reflect less (or no) overtime. Doc. No. [101-1], ¶23; see also Doc. No. [111], pp. 182, 196, 215-16, 239, 248-52. She asserted that throughout her time working for Silverton (after March 1, 2017), she told Freas, "I work all the time.... I work a lot of hours that I'm not reporting and not being-not being paid for." Doc. No. [111], p. 414. According to Plaintiff, all of her communications with Freas regarding overtime were oral discussions. Doc. No. [84-2], ¶35.
Other underwriters' timesheets also show weeks in which they reported, and were paid for, overtime. See Doc. Nos. [81-7]; [119-8]. Various of the underwriters deposed by Plaintiff confirmed that they reported the overtime hours they worked, including amounts that exceeds seven hours. Doc. No. [84-2], ¶21.
On April 25, 2017, Freas forwarded an email from Jen Burns to Plaintiff and the other underwriters regarding a training course. See Doc. No. [111-53]. Burns asked for Freas to provide her with the underwriters' certificates. Id. at 2. Freas asked the underwriters to send him their certificates from the course. Id. Plaintiff responded that she would have to complete the training course on the weekend, as overtime, because of her workload. Id. When Freas pointed out that the training course had been assigned a month prior, Plaintiff replied, "It takes me the hold [sic] day to complete whatever is assigned in order to stay current on my turn time even a month ago. I work over all the time but I just don't enter any time as overtime in order to meet my turn times on my assigned loans." Id. at 1. Freas responded, "Understood." Id.
Silverton maintains computer activity logs, which show specific time periods that employees are logged into the system. See Doc. No. [84-2], ¶62. These logs do not show what an employee was working on while logged in. Id. During her deposition, when asked about the computer activity log from Silverton, Plaintiff testified:
Q. Is it your position that from the time that you signed on to the Sterling system each day you were actively working on behalf of Silverton during the entire period that you remained signed on to that system?
A. Yes.
*1171 Q. So from the moment that you signed on until the last activity of the day was reflected you were working on Silverton business?
A. Yes.
Doc. No. [112], pp. 11-12. Plaintiff's computer activity log reflects gaps in computer activity for large periods of time during the day. Doc. No. [84-2], ¶23; see also Doc. No. [119-10]. During several of those gaps, documentary evidence reflects that Plaintiff was attending job interviews, doctors' appointments, photo sessions, and school orientations. See Doc. No. [84-2], ¶¶41-60. Plaintiff's email records reflect emails sent from her work account during some of these gaps. Doc. No. [84-2], ¶¶116-19; see also Doc. Nos. [82-2] to [82-35]. The email records also show that she sent numerous emails to her manager outside of "regular" work hours. Doc. No. [101-1]; ¶¶39-75; see also Doc. Nos. [82-2] to [82-35].
III. ANALYSIS
Both parties have moved for summary judgment. Doc. Nos. [60]; [61]. As summary judgment standards require, for each motion, the Court must view the facts in the light most favorable to the non-movant. Therefore, the Court examines each motion separately.
A. Plaintiff's Motion for Partial Summary Judgment
Plaintiff moves for summary judgment seeking to dismiss Defendant's affirmative defense that Plaintiff was exempt from the FLSA's provisions under the administrative employee exemption. Doc. No. [60-1].
1. FLSA Exemption Standards
The FLSA exempts from its provisions "any employee employed in a bona fide executive, administrative, or professional capacity." 29 U.S.C. § 213(a)(1). "A job title alone is insufficient to establish the exempt status of an employee." 29 U.S.C. § 541.2. The applicability of an exemption relies on an analysis of the employee's actual job duties. See id. Because the applicability of an exemption involves both matters of law and fact, where the facts are in dispute, the exempt status of an employee is a question for the jury. See Wagner v. Murphy Oil USA, Inc., 139 F. App'x 131, 132 (11th Cir. 2005).
In order for the administrative exemption to apply, an employee must be compensated on a salary basis of not less than $ 455 per week, the employee's primary duty must be the "performance of office or non-manual work directly related to the management or general business operations of the employer or the employer's customers," and the primary duty must involved "the exercise of discretion and independent judgment with respect to matters of significance." 29 C.F.R. § 541.200(a). The employer bears the burden of proving that an exemption applies. Abel v. S. Shuttle Servs., Inc., 631 F.3d 1210, 1212 (11th Cir. 2011). The first prong is not in dispute in this case. Rather, Plaintiff argues that her primary duty did not satisfy either of the last two prongs.
i. Related to the management or general business operation
Under this prong, an employee's work must be related "to assisting with the running or servicing of the business, as distinguished, for example, from working on a manufacturing production line or selling a product in a retail or service establishment." 29 U.S.C. § 541.201(a). The exemption "relates to employees whose work involves servicing the business itself-employees who can be described as staff rather than line employees." U.S. Dep't of Labor, Wage & Hour Div., Opinion Letter, 2010 WL 1822423, at *2 (Mar. 24, 2010) (citation omitted).
*1172 "This 'production versus administrative' dichotomy is intended to distinguish between work related to the goods and services which constitute the business'[s] marketplace offerings and work which contributes to running the business itself." Id. at *3 (internal quotation and citation omitted); see also Davis v. J.P. Morgan Chase & Co., 587 F.3d 529, 535 (2d Cir. 2009) ("[W]e have drawn an important distinction between employees directly producing the good or service that is the primary output of a business and employees performing general administrative work applicable to the running of any business.").
However, this dichotomy "is only determinative if the work falls squarely on the production side of the line." 69 Fed. Reg. 22122, 22141 (Apr. 23, 2004). Where the "production versus administrative" dichotomy is not determinative, courts within the Eleventh Circuit examine other factors, such as the employee's reliance on guidelines that closely prescribe their actions and the employer's compensation and production incentives. See Colyer v. SSC Disability Servs., LLC, No. 11-20984, 2012 WL 882500, at *6-10 (S.D. Fla. Mar. 14, 2012).
ii. Exercise of discretion and independent judgment with respect to matters of significance
"In general, the exercise of discretion and independent judgment involves the comparison and the evaluation of possible courses of conduct, and acting or making a decision after the various possibilities have been considered." 29 C.F.R. § 541.202(a). "The term 'matters of significance' refers to the level of importance or consequence of the work performed." Id. The determination of whether an employee exercises "discretion and independent judgment" is a fact-intensive, situation-specific inquiry. 29 C.F.R. § 541.202(b). A non-exhaustive list of relevant factors to consider includes:
whether the employee has authority to formulate, affect, interpret, or implement management policies or operating practices; whether the employee carries out major assignments in conducting the operations of the business; whether the employee performs work that affects business operations to a substantial degree, even if the employee's assignments are related to operation of a particular segment of the business; whether the employee has authority to commit the employer in matters that have significant financial impact; whether the employee has authority to waive or deviate from established policies and procedures without prior approval; whether the employee has authority to negotiate and bind the company on significant matters; whether the employee provides consultation or expert advice to management; whether the employee is involved in planning long- or short-term business objectives; whether the employee investigates and resolved matters of significance on behalf of management; and whether the employee represents the company in handling complaint, arbitrating disputes or resolving grievances.
Id. Generally, employees exercising this type of discretion and judgment are free from immediate supervision. 29 C.F.R. § 541.202(c). Their decisions may or may not be reviewed at a higher level. Id. However, this type of judgment requires "more than the use of skill in applying well-established techniques, procedures or specific standards described in manuals or other sources." 29 C.F.R. § 541.202(e). Additionally, "[a]n employee does not exercise discretion and independent judgment with respect to matters of significance merely because the employer will experience financial losses if the employee fails to perform *1173 the job properly." 29 C.F.R. § 541.202(f).
2. Discussion
While the nature of Plaintiff's job duties is a question of fact, the applicability of an exemption to those duties is a matter of law. See Icicle Seafoods, Inc. v. Worthington, 475 U.S. 709, 714, 106 S.Ct. 1527, 89 L.Ed.2d 739 (1986). In this case, it is undisputed that Plaintiff's job was to review loan applications, utilizing lender guidelines and criteria, to determine whether or not to approve the loan. It is also undisputed that Silverton's business is to originate, and then sell, these loans. The Eleventh Circuit has not ruled squarely on the issue of whether mortgage underwriters such as Plaintiff are exempt employees under the FLSA. Therefore, the Court looks to other circuit's interpretations of the administrative exemption.
Ultimately, it is Silverton's burden to show that the exemption applies, and Silverton has failed to do so. This is true even under the "fair" interpretation of an exemption required by the Supreme Court's Encino decision. See Encino Motorcars, LLC v. Navarro, --- U.S. ----, 138 S. Ct. 1134, 1142, 200 L.Ed.2d 433 (2018). Silverton must demonstrate that all three prongs of the administrative exemption are met; and, while the first prong is not in dispute, the Court is unconvinced that Plaintiff's primary duties meet the requirements of the second and third prongs.
i. Related to general business operations
Defendant notes a circuit split on whether underwriting mortgage loans-in factually similar circumstances (i.e., reviewing loan applications and deciding whether to approve them)-qualifies as being "related to general business operations." The Sixth Circuit, in Lutz v. Huntington Bancshares, Inc., found that "underwriters perform administrative work because they assist in the running and servicing of the Bank's business by making decisions about when Huntington should take on certain kinds of credit risk." 815 F.3d 988, 993 (6th Cir. 2016). It viewed the underwriters' job as primarily "servicing" or "advising" the bank's business, rather than being the main thrust of the bank's business. See id. at 993. The court noted that the Lutz case was factually similar to a case from the Second Circuit, Davis v. J.P. Morgan Chase & Co., which found that underwriting was not administrative work. Id. at 995. However, the Sixth Circuit endorsed the lower court's rejection the Davis case, because it was inconsistent with circuit precedent. Id.
In the Davis case, the Second Circuit conducted a thorough analysis of the factors involved in the second prong of the administrative exemption-surveying Department of Labor guidance, circuit case law, and district court case law-and concluded that "underwriters tasked with approving loans, in accordance with detailed guidelines provided by their employer" are not exempt administrative employees. 587 F.3d 529, 530, 537 (2d Cir. 2009). The court noted that the underwriters in that case "were given a loan application and followed procedures specified in the Credit Guide in order to produce a yes or no decision." Id. at 534. In addition, the bank paid the underwriters production incentives, indicating that it "believed that the work of underwriters could be quantified in a way that the work of administrative employees generally cannot." Id. at 535. Therefore, the court deemed the underwriters part of the bank's "production of loans-the fundamental service provided by the bank." Id. at 534.
The Ninth Circuit reached a similar result in *1174 McKeen-Chaplin v. Provident Savings Bank, FSB, 862 F.3d 847 (9th Cir. 2017). It-like the Second Circuit in Davis-rejected the Sixth Circuit's contention that underwriters reviewing loan applications functioned as advisors or servicers to the bank's main business. Id. at 852. Instead, it noted that "underwriters do not decide if [the financial institution] should take on risk, but instead assess whether, given the guidelines provided to them from above, the particular loan at issue falls within the range of risk [the financial institution] has determined it is willing to take." Id. (emphasis in original).
It also noted that classifying mortgage underwriters as performing work related to "general business operations" was inconsistent with the financial-services industry example provided in the Code of Federal Regulations. Id. at 853 ; see also 29 C.F.R. § 541.203(b). That example provided four factors that, when present, generally met the exemption. While mortgage underwriters regularly engaged in one of those factors (collecting and analyzing information regarding the customer's income, assets, investments or debts), and "sometimes" a second factor (determining which financial products met customers' needs), they did not engage at all in advising customers regarding financial products, or in marketing or promoting the financial products). McKeen-Chaplin, 862 F.3d at 854. Therefore, the Ninth Circuit concluded the underwriters were not "administrators who manage, guide, and administer the business," but were engaged in production of the business's service. Id.
In the absence of contrary precedent within this Circuit, the Court agrees with the Second and Sixth Circuits' analyses. Like the underwriters in Davis and McKeen-Chaplin, Plaintiff analyzed loan applications utilizing pre-determined guidelines for risk provided to her by her employer and arrived at a yes-or-no decision on the application. There is no dispute that she never advised customers or marketed Silverton's loans. Furthermore, the fact that Silverton paid underwriters bonuses based on the amount of loans they "turned" and the accuracy of those decisions, indicates that Silverton viewed the underwriters' role as one related to production. Therefore, this Court determines that Plaintiff's job did not relate to management or to general business operations as contemplated by the Code of Federal Regulations.
ii. Discretion and independent judgment on matters of significance
Defendant argues that Plaintiff's job duties satisfy the third prong because she exercised discretion and independent judgment to ultimately decide whether Silverton should assume the risk of a particular loan. Doc. No. [85], pp. 23-25. Defendant also argues that her work involved matters of significance because her choices bound Silverton "on substantial financial matters without seeking prior approval or signoff." Id. at 26.
But, in light of the guidance provided in the Code of Federal Regulations, the Court does not find this to be the type of discretion and independent judgment envisioned by the exemption. First, Plaintiff's discretion and judgment regarding Silverton's risk was not truly independent: the guidelines prescribed the parameters of risk that Silverton would be willing to take on and Plaintiff had to work within those parameters. Plaintiff had no authority or discretion to independently decide to revise Silverton's risk tolerance. While Plaintiff could decide to require additional conditions of a customer or to investigate a suspicious appraisal value, she could not decide to expand the scope of defined risk that the lender was willing to take on. Rather than truly "independent" judgment, Plaintiff's job involved using her *1175 training and years of experience to arrive at decisions that comported with, and were guided by, the guidelines. Furthermore, as the Code of Federal Regulations explicitly noted, it is not enough that Silverton would experience financial consequences if Plaintiff made errors in judgment. Therefore, the Court determines that Plaintiff did not exercise discretion and independent judgment on matters of significance.
B. Defendant's Motion for Summary Judgment
Defendant moves for summary judgment regarding Plaintiffs' claims on two grounds: (1) Silverton lacked any knowledge of Plaintiff working overtime for which she was not paid, and (2) Plaintiff cannot meet her burden of showing she performed work for which she was not paid. Doc. No. [61], p.13. Additionally, Defendant seeks summary judgment on any claim for overtime prior to March 1, 2017, when Silverton's new overtime policy was communicated to the underwriters. Id. at 26.
1. Knowledge of Plaintiff Working Overtime For Which She Was Not Paid
Defendant argues that Plaintiff's claims regarding Silverton's overtime policy are "flatly contradicted by the record, and no reasonable jury could believe Plaintiff's testimony." Id. at 14. However, Defendant's own argument demonstrates that there are competing pieces of evidence in the record, creating a dispute of fact to be resolved by the jury.
First, Defendant asserts that there is no dispute that Silverton did not limit the number of overtime hours that Plaintiff could report and be paid for. Id. at 13. However, the email from Freas to the underwriters regarding Silverton's overtime policy is open to a contrary interpretation. While Defendant asserts that it "simply required underwriters to request pre-approval for overtime and to try not to work more than 7 overtime hours each week," a reasonable jury could find otherwise. Id. at 14. The email does not say underwriters should try not to work more than 7 hours of overtime; it says "Max OT is 7 hours per week." Doc. No. [119-42]. A jury could find that the policy placed a hard limit on overtime. Also, the email says "[t]o justify OT, the pipeline must exceed the minimum 2 new loans and 3/4 conditions without extenuating circumstances." Id. A reasonable jury could conclude that overtime, regardless of whether it was being worked or not, would not be approved unless the required amount of loans and conditions were completed. Furthermore, in the April 25, 2017 email, Plaintiff indicated that she was working overtime hours which she was not reporting and for which she was not getting paid. See Doc. No. [111-53]. A reasonable jury could, in conjunction with the email regarding the overtime policy, find that Freas knew Plaintiff was working overtime that under Silverton's policy she was not allowed to report.
Defendant points to Plaintiff's timesheets and those of other underwriters as proof that the policy did not prohibit underwriters from reporting and receiving more than seven hours of overtime. Doc. No. [61], p. 14. However, the fact that on some occasions Plaintiff reported (or was allowed to report) overtime, and was paid for it, does not defeat her claim that there were other hours that she worked that she was not allowed to report and was not paid for. Likewise, the fact that other underwriters were paid for overtime hours they reported (even in excess of seven hours), does not conclusively demonstrate the falsity of Plaintiff's claims.
*1176 Second, Defendant also argues there is no dispute that Silverton did not instruct Plaintiff to underreport her overtime hours. Id. at 13. Defendant contends Plaintiff's deposition testimony about her conversations with Freas regarding changing her timesheets occurring by phone on Monday mornings is "conclusively contradict[ed]" by the phone logs which do not show any phone calls between Plaintiff and Freas. Id. at 15. However, Plaintiff also testified to in-person conversations. See Doc. No. [111], pp. 206-07, 300-01, 411-12. The believability of Plaintiff's testimony is a question for the jury.[2]
2. Establishing Hours Worked
Defendant first argues that the burden-shifting scheme laid out in Anderson v. Mt. Clemens Pottery Co., 328 U.S. 680, 66 S.Ct. 1187, 90 L.Ed. 1515 (1946), does not apply because Silverton kept accurate and adequate time records. Doc. No. [61], pp. 16-17. However, Plaintiff's claims are that Silverton did just the opposite. Plaintiff is claiming that the records Silverton maintained are not accurate because she was instructed not to report all of her hours on her time sheets. If there were no evidence in the record to support that claim, applying the burden-shifting framework might be inappropriate. However, the March 1, 2017 and April 25, 2017 emails provide enough evidence to suggest that Silverton's time records may be inaccurate. Therefore, Mt. Clemens Pottery's burden-shifting scheme does apply.
Defendant then contends that even under the burden-shifting framework, Plaintiff's claims fail as a matter of law. Defendant argues that Plaintiff cannot rely on mere speculation, and she cannot proffer sufficient evidence for a jury to reasonably conclude that she worked overtime hours or the extent of those hours. Doc. No. [61], p. 20-21. According to Defendant, "Plaintiff's claims concerning the hours she purportedly worked have varied dramatically over the course of discovery and are based on bare assertions and rank speculation." Id. at 21.
The Court previously addressed Defendant's argument about the evolution of Plaintiff's claims in its order on Defendant's motion for sanctions. The same rationale applies here. There is no doubt that Plaintiff's estimation of her hours changed from the one given in her complaint and initial disclosures. However, most FLSA plaintiffs have to start with a reconstruction of their hours from memory. Revision of that estimate after a plaintiff receives materials from her employer through discovery is common. Even if her revision was "dramatic," as Defendant describes it, that does not automatically make it speculative or false.
As for support for Plaintiff's approximations, her amended interrogatory responses show that her revised estimates are based on Silverton's computer activity logs and parking records. See Doc. No. [119-40].
*1177 Defendant, again, asserts that these records are contradicted by the record. Doc. No. [61], p. 25. It is true that Defendant has evidence that, during some of the times Plaintiff estimates she was working, she was actually at doctor's appointments or other engagements. But, that does not necessarily negate all of Plaintiff's estimate. In addition to Silverton's computer and parking logs, Plaintiff cites evidence of emails sent outside of work hours. It is for the jury to determine how credible Plaintiff's claims and testimony are, and whether she has adequately demonstrated that she worked hours for which she was not paid. To be sure, Plaintiff has an uphill battle. Defendant has plenty of impeachment evidence with which to undermine Plaintiff's credibility. But, such a determination is for the jury to make; not for this Court to make at summary judgment.
3. Overtime Hours Prior to March 1, 2017
Defendant also presents a cursory argument that it is entitled to summary judgment on any overtime claims prior to March 1, 2017, because "Plaintiff has not presented any evidence that Silverton knew prior to its implementation of the new overtime policy that Plaintiff was working overtime." Doc. No. [61], p. 26. Plaintiff provides, if possible, an even more cursory response which asserts that a reasonable jury could infer employer knowledge from the numerous emails Plaintiff sent to her manager outside of work hours. Doc. No. [84], p. 25. The Court provides an appropriately cursory ruling. Defendant pointed to a lack of evidence in the record, and Plaintiff responded by pointing to evidence in the record. Therefore, summary judgment is inappropriate.[3]
IV. CONCLUSION
For the foregoing reasons, Plaintiff's Motion for Partial Summary Judgment is GRANTED . Doc. No. [60]. Defendant's Motion for Summary Judgment is DENIED . Doc. No. [61]. The parties are ORDERED to file their consolidated pre-trial order within thirty (30) days of the entry of this order.
IT IS SO ORDERED this 21st day of March, 2019.

The Court does not attempt to resolve objections that do not comport with the Local Rules. See NDGa LR 56.1(B)(2), (3) (requiring "concise, nonargumentative responses" that either (1) directly refute the fact with concise responses supported by specific evidence, (2) state a valid objection to the admissibility of the fact, (3) point out that the citation does not support the fact, or (4) object that the fact is not material). The parties frequently provide voluminous, argumentative responses, spanning multiple pages, which do not simply refute a given fact, but attempt to introduce new facts or to argue for a different characterization of a fact. See, e.g., Doc. Nos. [85-1], ¶ 4 (response spans eight pages); [100-2], ¶6 (response spans four pages). The parties also frequently use phrases in their responses such as "subject to the foregoing ..." or "by way of further clarification ..." as a precursor to the introduction of new facts or an argument for a different characterization of a fact. See, e.g., Doc. Nos. [84-2], ¶ 1; [85-1], ¶5; [100-2], ¶4. The Local Rules do not allow for the introduction of facts through a party's response. Therefore, the Court only considers facts laid out in the parties' statements of fact or statements of additional fact, and does not consider those introduced in the parties' responses. The Local Rules also do not provide for argument in a party's response; the parties should reserve argument for their briefs. Therefore, the Court ignores argumentative responses. Defendant Silverton frequently objects to a fact on the grounds that it is "vague and ambiguous." See, e.g., Doc. No. [85-1], p. 16. As this is not a proper objection under LR 56.1, and as the stated facts with supporting evidence speak for themselves, the Court overrules these objections.

The conflicting evidence in this case is very different from that cited by Defendant in Scott v. Harris, 550 U.S. 372, 378-79, 127 S.Ct. 1769, 167 L.Ed.2d 686 (2007). In that case, the lower court described the driver that was fleeing from police in a manner that made him seem controlled, careful, and not a threat to other motorists. See id. at 379, 127 S.Ct. 1769. The videotape from the police cruiser showed the driver going "shockingly fast," swerving, crossing the center line, running red lights, and forcing other vehicles to the shoulder of the road. The Court concluded that the Court of Appeals should have viewed the facts in light of the videotape and not accepted the version of facts proffered by the driver. Based on the indisputable video evidence, no jury could believe the driver was not endangering human life. Id. at 380, 127 S.Ct. 1769. In this case, there is no such "indisputable" video evidence. Plaintiff's deposition contains multiple contradictions. Which of her assertions, if any, are accurate or believable is for the jury to determine.

If Defendant wanted the Court to address the sufficiency of the evidence cited by Plaintiff, it must provide the Court more than a conclusory statement that the evidence is insufficient. See Doc. No. [101], p. 16. Arguments, especially those that seek to foreclose claims at summary judgment, must be supported by citation to authority and appropriate analysis.